537-07/ROSS/PLS
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
PHOENIX BULK CARRIERS LTD.
80 Pine Street
New York, NY 10005
Telephone: (212) 425-1900
Facsimile: (212) 425-1901
James L. Ross (JR 6411
Pamela L. Schultz (PS 8675)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

PHOENIX BULK CARRIERS LTD.



                    Plaintiff,

       -against-

UNICARBON LIMITED and
DYNACOAL LIMITED,

                    Defendants.
-------------------------------------------------------x

**VERIFIED COMPLAINT**

        Plaintiff PHOENIX BULK CARRIERS LTD. ("PBC"), through its attorneys

Freehill Hogan & Mahar, LLP, as and for its Verified Complaint against Defendants

UNICARBON    LIMITED    ("UNICARBON"),    and    DYNACOAL    LIMITED

("DYNACOAL"), alleges upon information and belief as follows:

### JURISDICTION

        1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime

contract of affreightment ("COA"). The case also falls within the Court's admiralty and

maritime jurisdiction pursuant to 28 U.S.C. §1333. Jurisdiction is also proper pursuant to

the Federal Arbitration Act, 9 U.S.C. §1 *et seq.* and/or 9 U.S.C. §201 *et seq.*

## THE PARTIES

2.    At all relevant times, Plaintiff PBC was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an agent in care of Phoenix Bulk Carriers (US) Corp. in Rhode Island.

3.    At all times relevant hereto, Defendant UNICARBON was and still is a foreign business entity duly organized and existing under the laws of the British Virgin Islands with an address at Geneva Place, 3rd Floor, P.O. Box 3175, Road Town, Tortola, British Virgin Islands.

4.    At all times relevant hereto, Defendant DYNACOAL was and still is a foreign business entity fully organized and existing under the laws the laws of the British Virgin Islands with an address at the same place as UNICARBON, namely, Geneva Place, 3rd Floor, P.O. Box 3175, Road Town, Tortola, British Virgin Islands.

## THE CLAIM

5.    On or about April 29, 2005, Plaintiff PBC entered into a COA with UNICARBON requiring three (3) shipments of coal from China to Turkey. A copy of the fixture recap and pro forma charter party are attached as Exhibit A.

6.    Pursuant to the terms of the COA, Plaintiff PBC provided a vessel to the Defendant UNICARBON and the initial voyage was performed without incident.

7.    Thereafter, and in breach of the COA, the Defendant UNICARBON refused to perform the remaining two (2) voyages under the COA by declining to nominate any cargoes for those shipments, which failure of performance resulted in damages to the Plaintiff PBC in the way of lost in profits in the sums of $379,437.86 and $416,247.86 for the non-performance of the second and third voyages, respectively.

8.    Plaintiff PBC has made a demand for payment of the above sums, but no part of the loss or damage has been paid.

9.    Pursuant to the terms of the COA, all claims between the parties arising out of the COA are subject to London arbitration, with English law to apply, and the Plaintiff PBC reserves its rights to have the substantive aspects of this claim arbitrated in London.

### BASIS FOR CLAIM AGAINST DYNACOAL

10.    Upon information and belief, and after due investigation, Plaintiff submits that the Defendant DYNACOAL is a successor in interest and/or alter ego of the defendant UNICARBON, and as such, is responsible for the obligations and liabilities under the above referenced COA - both entities being shell instrumentalities of a Turkish coal importing group of companies as described more fully below.

11.    On November 7, 2002, UNICARBON was created as a British Virgin Island corporate entity and was assigned Company Registration No 520059.

12.    At the time of its incorporation, UNICARBON had a share capital of only $50,000 and a registered agent in care of Aleman, Cordero Galindo & Lee Trust Limited.

13.    UNICARBON provided, as its purported address, Geneva Place, 3rd Floor, P.O. Box 3175, Road Town, Tortola, British Virgin Islands.

14.    Despite its purported business presence in the BVI's, UNICARBON never had nor does it have any true business or physical presence there, and all day-to-day activities conducted by UNICARBON were actually performed by the offices of the above-referenced Turkish coal importing group generally known as Enerji Maden.

15.    Enerji Maden consists of a group of coal importing entities in Turkey which are involved in, *inter alia*, the importation, processing, packaging and transportation of coal throughout Turkey.

16.    The actual corporate name of the parent entity in the group is Enerji Maden Urunleri Sanayi ve Ticaret A.S., and the parent operates two separate coal receiver entities in Turkey including:

> Super Enerji Madencilik Ins. Ve Tic. A.S.  ("Super Enerji")
>
> Super Karbon Madencilik Ins. Ve Tic. A.S.  ("Super Karbon")

17.    All the entities described in the preceeding paragraph (collectively referred to as "Enerji Maden") operate from the same business address located at Buyukdere Cad, Akabe Is Merkaezi No: 78-80 Kat.4, Mecidiyekoy – Istanbul, Turkey, and it was from this business address that UNICARBON, and later DYNACOAL were formed and then operated and controlled.

18.    Prior to the COA in question, Enerji Maden had caused to be created the shell entity DYNACOAL in the BVI's (as described above in paragraphs 11 through 14) to act in the capacity as the chartering entity in whose name coal imported for the Enerji Maden group would be transported into Turkey.

19.    The purpose behind the creation of such an offshore shell entity is to shield the true and prime movers of the product from liability for any trade debt which may be incurred in connection with the transport of the raw material (in this case, coal).

20.    Specifically, and pursuant to a supply contract with China National Coal Industry Qinhuangdao Import/Export Co. Ltd., Enerji Maden utilized UNICARBON as the shell

entity in whose name coal would be imported from China and carried under chartered vessels like those nominated by the plaintiff PBC under the subject COA.

21.    At all times material hereto, however, UNICARBON functioned without adequate capital or any independent corporate existence, its business functions and operations being performed through the Enerji Maden offices, and/or brokers nominated by those offices who inserted the name UNICARBON (or derivative names as described below) as the purported entity in whose name vessels would be chartered for the importation of coal at various ports within the Sea of Marmora.

22.    In an effort to shield its true identity, UNICARBON was identified itself in other corporate forms such as "UNICARBON UK Ltd." or UNICARBON Ltd. of the UK", but investigation has revealed that no such entities existed in any jurisdiction involving the UK including Northern Ireland, Scotland, England or Wales, or at any of the offshore registries in the Isle of Man, Gurnsey, Jersey, or Alderney.

23.    After the performance of the first voyage of the COA, there was a decrease in the freight market, and in an effort extricate itself from its obligations under the COA, no nominations of cargo were made by UNICARBON for the second or third shipments giving rise to the claim as aforesaid.

24.    Shortly after the breach as described above, and through the offices of Enerji Maden, arrangements were made for a new BVI corporate shell – this one to be named DYNACOAL, which was formed in the British Virgin Islands in the identical fashion to the prior formation of UNICARBON.

25.    Specifically DYNACOAL was formed September 23, 2005, again with minimal capital of only $50,000, with the same registered agent as UNICARBON (i.e. Aleman,

Cordero Galindo & Lee Trust Limited.), and with the same bogus address previously utilized by UNICARBON – namely, Geneva Place, 3rd floor, Road Town, Tortola.

26.     Like UNICARBON, DYNACOAL had no physical office or presence at that location, and instead was operated, like UNICARBON, from the offices of Enerji Maden.

27.     DYNACOAL has since been utilized by the Enerji Maden group as the chartering entity for the transportation and importation of coal into Turkey in the same manner in which it previously used UNICARBON, and Enerji Maden and the corporations within the group including Super Enerji and Super Karbon, control and dominate UNICARBON from the same Turkish offices as they operated DYNACOAL.

28.     Further investigation with brokers in the subject coal trade have confirmed DYNACOAL's position within the Enerji Maden group of companies in the same manner in which UNICARBON had previously been maintained.

29.     Following the formation of its new chartering shell DYNACOAL, coal shipments being imported by the Enerji Maden group (including coal shipments for Super Enerji and Super Karbon) are now being booked in the name of the new successor shell entity DYNCACOAL so as to avoid liability for the prior debts of, *inter alia,* the Enerji Maden chartering shell UNICARBON.

30.     UNICARBON, like DYNACOAL before it, lack any true corporate existence, are insufficiently capitalized, and maintain no distinct corporate office or presence apart from that maintained by the offices of the Enerji Maden group and should be considered as successors in interest and alter-egos of each other for purposes of the imposition of liability under the subject COA.

### RULE B MARITIME ATTACHMENT

31.    This action is brought in order to obtain security in favor of Plaintiff PBC in respect to Plaintiff's claims, including but not limited to the principal amount of the claim, plus interest estimated until the time of entry of judgment or an award, plus Plaintiff's anticipated attorney fees and costs in arbitration, all of which are recoverable as a part of Plaintiff's main claim under English law.

32.    After investigation, none of the Defendants can be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendants have, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, credits, debts, wire transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendants, or any of them ("ASSETS"), including but not limited to ASSETS at, through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

33.    The amount of Plaintiff's claim sought to be attached pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims by Plaintiff against Defendants is as follows:

      a.  Principal outstanding in the sum of $795,685.72;

      b.  Interest in the amount of $143,223.42 calculated on the sum of $795,685.72 at the rate of 6% per annum, compounded quarterly, for three years, the estimated time it will take to obtain a final

arbitration award, which interest is recoverable in arbitration under English law;

c.  Estimated costs, including legal fees, of London arbitration, which are recoverable under English law in the amount of $150,000.00.

For a total amount sought to be attached of **$1,088,909.14**

WHEREFORE, Plaintiff PBC prays:

a.  That process in due form of law according to the practice of this Court issue against Defendants, citing them to appear and answer the foregoing, failing which a default will be taken against them for the principal amount of the claim of $795,685.72, plus interest, costs and attorneys fees;

b.  That if Defendants cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendants, up to and including the claim of **$1,088,909.14**, be restrained and attached, including, but not limited to any cash, funds, escrow funds, debts, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or other assets of, belonging to, due or being transferred to, from, or for the benefit of Defendants (collectively "ASSETS"), including but not limited to such ASSETS as may be held, received or transferred in their own names or as may be held, received or transferred for their benefit at, moving through, or within the possession, custody or control of banking institutions and/or

any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c.    That the Court enter an order directing Defendants to appear and respond in the London arbitration as required, or, to the extent an award is rendered against the Defendants, or any of them, to confirm that award as a judgment of this Court; and

d.    That Plaintiff has such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
       November 16, 2007

                              FREEHILL HOGAN & MAHAR, LLP
                              Attorneys for Plaintiff
                              PHOENIX BULK CARRIERS LTD.


By: _____
                              Peter J. Gutowski (PG 2200)
                              Pamela L. Schultz (PS 8675)
                              80 Pine Street
                              New York, NY  10005
                              Telephone: (212) 425-1900
                              (212) 425-1901 Fax

<u>ATTORNEY VERIFICATION</u>

State of New York    )
                     ) ss.:
County of New York  )

      PETER J. GUTOWSKI, being duly sworn, deposes and says as follows:

      1.    I am an attorney associated with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

      2.    The sources of my information and the grounds for my belief are communications from our client and documents provided by our client regarding the claim, as well as the Points of Claim submitted in London arbitration.

      3.    The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

                                 PETER J. GUTOWSKI

Sworn to before me this
16th day of November 2007

Notary Public

JOAN SORRENTINO
Notary Public, State of New York
No. 01SO6067227
Qualified in New York County
Commission Expires December 3, 2009

05_0430COAFixRecap1

From: Ed Coll
Sent: Saturday, April 30, 2005 8:34 AM
To: Operations
Subject: FW: PBC TBN/UNICARBON FIXTURE RECAP


-----Original Message-----
From: Istanbul Mid-Ship [mailto:istanbul@midship.com]
Sent: Friday, April 29, 2005 1:22 PM
To: Ed Coll
Subject: PBC TBN/UNICARBON FIXTURE RECAP


To: Phoenix Bulk Carriers

Ed/Cem

GOOD AFTERNOON ED,

+Phoenix TBN+
3 x 50-60,000 mts Coal
Unicarbon C/P dated April 29, 2005
--
Further our various phn and e-mail exchanges past several days, we are
pleased to recap you below how we are now 100 pct fixed clean in ac
cordance
with yr auth as follows:


C/P Dated April 29, 2005
---


PHOENIX BULK CARRIER TBN
GRD/GLESS BULKER MAX 25 YRS
CLASSED HIGHEST LLOYDS OR EQUIV

-SUB FINAL PORT APPRVL FOR EACH NOMINATION WHICH TO BE LIFTED LATES
T 24
HRS AFTER OWS' NOMINATION WHICH WILL NOT BE UNREASONABLY WITHHELD

-A/C : UNICARBON LTD/UK
-OWS : PHOENIX BULK CARRIER USA
-OWS HV TO PROVIDE "NOC (NO OBJECTION CERTIFICATE) " FM HEADOWS FOR
FRT/DEMM PAYMENT
-EXACT PERFORMER TO BE NOMINATED 5 DAYS PRIOR COMMENCEMENT OF LAYCA
N FOR
EACH SHPMT
-3 X 50/60,000MT IN OWS OPT COAL IN BULK STOWING ABOUT 48'.

Page 1


EXHIBIT
A
tabbies

05_0430COAFixRecap1

-LOADPT : 1SB JING TANG GANG A/O 1SB XINGANG (FREE D/A AT XINGANG I
F
 USED AS 2ND L/P AND TIME TO COUNT UPON ARRIVAL)
-OWS TO CHECK AND SATISFY THEMSELVES REGARDING PORT RESTRICTIONS AT
BE
-DISPT : 1 SBP ISKENDERUN AND/OR SEA OF MARMARA AND/OR 1 SB NEMRUT
-LAYCAN : 7/15 JUNE , 7/15 JULY, 7/15 AUG
-LOAD RATE :10.000 MT PWWD OF 24 CONSEC HRS SHINC
-DISC RATE :10.000 MT PWWD OF 24 CONSEC HRS SHINC BSS MARMARA OR NE
MRUT
          15.000 MT PWWD OF 24 CONSEC HRS SHINC BSS ISKENDERUN
-LAYTIME FOR LOADING SHALL COMMENCE 24 HRS AFTER NOR TENDERED UNLES
S
 LOADING HAS COMMENCED EARLIER IN WHICH CASE ACTUAL TIME USED TO CO
UNT.
-18 HRS T/TIME AT D/PORT (OR 10 HRS T/TIME AT 1ST D/PORT AND 8 HRS
 T/TIME AT 2ND D/PORT, IF ANY ) UNLESS SOONER COMMENCED
-FRT : USD 23.- PMT FIO BSS 1/1 BSS MARMARA OR NEMRUT
      USD 22.- PMT FIO BSS 1/1 BSS ISKENDERUN
 EXT. USD 0.75 PMT FIO ON ENTIRE QTTY FOR 2ND D/P
-95 PCT PAYABLE W/I 7 BDAYS ACOL AND S/R BS/L WHICH TO BE PAID "FRT
 PAYABLE AS PER C/P DD.. TO OWS" AND "CLEAN ON BOARD"
-FREIGHT DEEMED EARNED ON CARGO BEING LOADED DISCPOUNTLESS AND
 NON-RETURNABLE VESSEL AND/OR CARGO LOST OR NOT LOST.
-NOR TO BE TENDERED W/W/W/W FM 8 AM TO 5 PM FM MONDAY TO FRIDAY AND
FM 8
 AM TO 12 NOON ON SATURDAY AT L/P, W/I 8/17 HRS SHINC AT D/P(S)
-DEMURRAGE USD 25.000 PDPR/HDWTS BE - NON REV
-BALANCE FRT TO BE SETTLED TOGETHER WITH DEM/DES W/I 30 DAYS AFTER


 COMPLETION OF DISCH
-ANY TAX/DUES/WHARFAGES ON CARGO TO BE FOR CHARTERER'S ACCOUNT.
 ANY TAX/DUES/WHARFAGES ON VESSEL/FREIGHT TO BE FOR OWNER'S ACCOUNT


-CHARTERER'S AGENT BE
 LBH/CHINA AT LOADPORT, AKSOY SHPG TURKEY AT DISPORT - OFFICAL TARI
FF
 TO APPLY FOR PORT DISB
-2.5% TTL adcom + 1.25 pct to Mid-ship ON F/D/D
-S/S/R APPRVLS ARE IN ORDER
-SUB FINAL PORT APPRVL FOR EACH NOMINATION WHICH TO BE LIFTED LATES
T 24
 HRS AFTER OWS' NOMINATION WHICH WILL NOT BE UNREASONABLY WITHHELD
-OWISE FULL TERMS/CONDITIONS/DETS BSD ON CHRTS EXE C/P AS AN E-MAIL
 ATTACHMENT DTD APRIL 28, 2005 AS AMENDED PER MAIN TERMS AGREED AND
 WITH
 FOLLOWING ALTERATIONS:

delete all refernce in c/p to vsls gear voyages to be perfomred by
gless
panamax vsls with shore appliances bends

Page 2

05_0430COAFixRecap1

cl 20 - para 3 add "unless commenced loading in which actual time used
to count"

cl 22 - delete para 2 ref2nd loadport as not applicable

cl 23 - para 2 - amend to read time to count on arrival if on dem , if
not
        as per recap

cl 24 - delete first 2 paragraphs (1 sb already agreed)

otherwise logical alts in accordance with main terms end
-END

ED, WE THANK YOU VERY MUCH FOR YR SUPER SUPPORT, EFFORTS AND COOPER
ATION
WHICH ENABLED US TO CONCLUDE THIS FIXTURE.

WE TRUST ABV RECAP IS IN LINE WITH YR NOTES WHC PLS CONFIRM. WE ARE
WISHING
SMOOTH AND UNEVENTFUL SAILINGS FOR ALL CONCERNED.


BEST REGARDS,

CEM KIRTELER
MID-SHIP ISTANBUL

28/08 '05 14:47 FAX 0                    AKSOY UKZ                    @01

ATTN MR. JOB OBBLENUS

ORIGINAL

12 PGS.

CARGO SERVICES LTD. CO.

17-0

PART II
"Gencon" Charter (As Revised 1922 and 1976)
Including "F.I.O" Alternative ,etc.

1. It is agreed between the party mentioned in Box 3 as Owners of the steamer or motor-vessel named in Box 5, of the gross/net Register tons as indicated in Box 6 and carrying about the number of tons of Deadweight cargo stated in Box 7, now in position as stated in Box 8 and expected ready to load under this Charter about the date indicated in Box 9, and the party mentioned as Charterers in Box 4 that: The said vessel shall proceed to the loading port or place stated in Box 10 as so near thereto as she may safely get and lie always afloat, and there load a full and complete cargo (if shipment of deck cargo agreed same to be at Charterers' risk) as stated in Box 12 (Charterers to provide all mats and/or wood for dunnage and any separations required, the Owners allowing the use of any dunnage wood on board if required) which the Charterers bind themselves to ship, and being so loaded the vessel shall proceed to the discharging port or place stated in Box 11 as ordered on signing Bills of Lading or so near thereto as she may safely get and lie always afloat and there deliver the cargo on being paid freight on delivered or intaken quantity as indicated in Box 13 at the rate stated in Box 13.

2. **Owners' Responsibility Clause**
Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by the improper or negligent stowage of the goods (unless stowage performed by shippers/Charterers or their stevedores or servants) or by personal want of due diligence on the part of the Owners or their Manager to make the vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied or by the personal act of default of the Owners or their Manager. And the Owners are responsible for no loss or damage or delay arising from any other cause whatsoever, even from the neglect or default of the Captain or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this Clause, be responsible, or from unseaworthiness of the vessel on loading or commencement of the voyage or at any time whatsoever. Damage caused by contact with or leakage, smell or evaporation from other goods or by the inflammable or explosive nature or insufficient package of other goods not to be considered as caused by improper or negligent stowage, even if in fact so caused.

3. **Deviation Clause**
The vessel has liberty to call at any port or ports at any order, for any purpose, to sail without pilots, to tow and/or assist vessels in all situations, and also to deviate for the purpose of saving life and/ or property.

4. **Payment of Freight** *SEE CLS 39*
The freight to be paid in the manner prescribed in Box 14 in cash without discount on delivery of the cargo at mean rate of exchange ruling on day or days of payment, the receivers of the cargo being bound to pay freight on account during delivery, if required by Captain or Owners. Cash for vessel's ordinary disbursements at port of loading to be Advanced by Charterers if required at highest current rate of exchange, subject to two per cent. to cover insurance and other expenses.

5. **Loading/Discharging Costs**
*(a) Gross Terms*
The cargo to be brought alongside in such a manner as to enable vessel to take the goods with her own tackle. Charterers to procure and pay the necessary men on shore or on board the lighters to do the work there, vessel only heaving the cargo on board. If the loading takes place by elevator, cargo to be put free in vessel's holds, Owners only paying trimming expenses. Any pieces and/or packages of cargo over two tons weight, shall be loaded, stowed and discharged by Charterers at their risk and expense. The cargo to be received by Merchants at their risk and expense alongside the vessel not beyond the reach of her tackle.
*(b) F.I.O and free stowed/trimmed*
The cargo shall be brought into holds, loaded, stowed and/or trimmed and taken from the holds and discharged by the Charterers or their Agents, free of any risk, liability and expense whatsoever to the Owners. The Owners shall provide winches, motive power and winchmen from the Crew if requested and permitted; if not, the Charterers shall provide and pay for winchmen from shore and/or cranes, if any. (This provision shall not apply if vessel is gearless and stated as such in Box 15.)
*indicate alternative (a) or (b), as agreed, in Box 15.*

6. **Laytime** *SEE CLS 20,22,23*
*(a) Separate laytime for loading and discharging*
The cargo shall be loaded within the number of running hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time actually used shall count. The cargo shall be discharged within the number of running hours as indicated in Box 16, weather permitting, Sundays and holidays excepted unless used, in which event time actually used shall count.
*(b) Total laytime for loading and discharging*
The cargo shall be loaded and discharged within the number of total running hours as indicated in Box 16, weather permitting Sundays and holidays excepted, unless used, in which event time actually used shall count.
*(c) Commencement of laytime (loading and discharging)*
Laytime for loading and discharging shall commence at 1 p.m. if notice of readiness is given before noon, and at 6 a.m. next working day if notice given during office hours after noon. Notice at loading port to be given to the Shippers named in Box 17.
Time lost in waiting for berth to count as loading or discharging time, as the case may be.
*Indicate alternative (a) or (b) as agreed in Box 16.*

7. **Demurrage** *SEE CLS 28*
Ten running days on demurrage at the rate stated in Box 18 per day or pro rata for any part of a day, payable day by day, to be allowed Merchants altogether at ports of loading and discharging.

8. **Lien Clause**
Owners shall have a lien on the cargo for freight, dead-freight, demurrage and damages for detention. Charterers shall remain responsible for dead-freight and demurrage (including damages for detention) incurred at port of loading. Charterers shall also remain responsible for freight and demurrage (including damages for detention) incurred at port of discharge, but only to such extent as the Owners have been unable to obtain payment thereof by exercising the lien on the cargo.

9. **Bills of Lading** *SEE CLS 39*
The Captain to sign Bills of Lading at such rate of freight as presented without prejudice to this Charterparty, but should the freight by Bills of Lading amount to less than the total chartered freight the difference to be paid to the Captain in cash on signing Bills of Lading.

10. **Cancelling Clause**
Should the vessel not be ready to load (whether in berth or not) on or before the date indicated in Box 19, Charterers have the option of cancelling this contract, such option to be declared, if demanded, at least 48 hours before vessel's expected arrival at port of loading. Should the vessel be delayed on account of average or otherwise, Charterers to be informed as soon as possible, and if the vessel is delayed for more than 10 days after the days she is stated to be expected ready to load, Charterers have the option of cancelling this contract, unless a cancelling date has been agreed upon.

11. **General Average**
General Average to be settled in London according to York-Antwerp Rules 1974. Proprietors of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or default of the Owners' servants (see clause 2).

12. **Indemnity**
Indemnity for non-performance of this Charterparty, proved damages, not exceeding estimated amount of freight.

13. **Agency** *SEE CLS 35*
In every case the Owners/Charterers shall appoint his own Broker or their Agent both at the port of loading and the port of discharge:

14. **Brokerage**
A brokerage commission on the gross freight, deadfreight, demurrage at the rate stated in Box 20 on the freight earned is due to the party mentioned in Box 20.
In case of non-execution at least ¼ of the brokerage on the estimated amount of freight and dead-freight to be paid by the Owners to the Brokers as indemnity for the latter's expenses and work. In case more voyages the amount of indemnity to be mutually agreed.

15. **GEGENERAL STRIKE CLAUSE**
Neither Charterers nor Owners shall be responsible for the consequences of any strikes or lock-outs preventing or delaying the fulfilment of any obligations under this contract.
If there is a strike or lock-out affecting the loading of the cargo, or any part of it, when vessel is ready to proceed from her last port or at any time during the voyage to the port or ports of loading or after her arrival there, Captain or Owners may ask Charterers to declare, that they agree to reckon the laydays as if there were no strike or lock-out. Unless Charterers have given such declaration in writing (by telegram, if necessary) within 24 hours, Owners shall have the option of cancelling this contract. If part cargo has already been loaded, Owners must proceed with same, (freight payable on loaded quantity only) having liberty to complete with other cargo on the way for their own account.
If there is a strike or lock-out affecting the discharge of the cargo on or after vessel's arrival at or off port of discharge and same has not been settled within 48 hours, Receivers shall have the option of keeping vessel until such strike or lock-out is at an end against paying half demurrage after expiration of the time provided for discharging, or of ordering the vessel to a safe port where she can safely discharge without risk of being detained by strike or lock-out. Such orders to be given within 48 hours after Captain or Owners have given notice to Charterers of the strike or lock-out affecting the discharge. On delivery of the cargo at such port, all conditions of this Charterparty and of the Bill of Lading shall apply and vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

16. **War Risks ("Voywar 1950")**
(1) In these clauses "War Risks" shall include any blockade or any action which is announced as a blockade, by any Government or by any belligerent or by any organized body, sabotage, piracy, and any actual or threatened war, hostilities, warlike operations, civil war, civil commotion, or revolution.
(2) If any time before the Vessel commences loading, it appears that performance of the contract will subject the Vessel or her Master and crew or her cargo to war risks at any stage of the adventure, the Owners shall be entitled by letter or telegram despatched to the Charterers, to cancel this Charter.
(3) The Master shall not be required to load cargo or to continue loading or to proceed on or to sign Bill(s) of Lading for any adventure on which or any port at which it appears that the Vessel, her Master and crew or her cargo will be subjected to war risks. In the event of the exercise by the Master of his right under this Clause after part or full cargo has been loaded, the Master shall be at liberty either to discharge such cargo at the loading port or to proceed therewith. In the latter case the Vessel shall have liberty to proceed to and load or for Owners' benefit and accordingly to proceed to and load or discharge such other cargo at any other port or ports whatsoever, backwards or forwards, although in a contrary direction to or out of or beyond the ordinary route. In the event of the Master electing to proceed with part cargo under this Clause freight shall in any case be payable on the quantity delivered.
(4) If at the time the Master elects to proceed with part or full cargo under Clause 3, or after the Vessel has left the loading port, or the

5

PART II
"Gencon" Charter (As Revised 1922 and 1976)
Including "F.I.O" Alternative ,etc.

last of the loading ports , if more than one, it appears that further
performance of the contract will subject the Vessel, her Master and
crew or her cargo, to war risks, the cargo shall be discharged, or if
the discharge has been commenced shall be completed, at any safe
port in vicinity of the port of discharge as may be ordered by the
Charterers. If no such orders shall be received from he Charterers
within 48 hours after the Owners have despatched a request by
telegram to the Charterers for the nomination of a substitute discharg-
ing port, the Owners shall be at liberty to discharge a cargo at
any safe port which they may, in their discretion, decide on and such
discharge shall be deemed to be due fulfilment of the contract of
affreightment. In the event of cargo being discharged at any such
other port, the Owners shall be entitled to freight as if the discharge
had been effected at the port or ports named in the Bill(s) of Lading
or to which the Vessel may have been ordered pursuant thereto.

205
206
207
208
209
210
211
212
213
214
215
216
217
218
219

(5) (a) The Vessel shall have liberty to comply with any directions
or recommendations as to loading, departure, arrival, routes, ports
of call, stoppages, destination, zones, waters, discharge, delivery or
in any other wise whatsoever (including any direction or recom-
mendation not to go to the port of destination or to delay proceeding
thereto or to proceed to some other port) given by any government or
by any belligerent, or by any organized body engaged in civil war,
hostilities or war-like operations or by any person or body acting or
purporting to act as or with the authority of any Government or
belligerent or of any such organized body or by any committee or
person having under the terms of the war risks insurance on the
Vessel, the right to give any such directions or recommendations. If,
by reason of or in compliance with any such direction or recom-
mendation, anything is done or is not done, such shall not be deemed
a deviation.

220
221
222
223
224
225
226
227
228
229
230
231
232
233
234

(b) If, by reason of or in compliance with any such directions or re-
commendations, the Vessel does not proceed to the port or ports
named in the Bill(s) of Lading or to which she may have been
ordered pursuant thereto, the Vessel may proceed to any port as
directed or recommended or to any safe port which the Owners in
their discretion may decide on and there discharge the cargo. Such
discharge shall be deemed to be due fulfilment of the contract of
affreightment and the Owners shall be entitled to freight as if
discharge had been effected at the port or ports named in the Bill(s)
of Lading or to which the Vessel may have been ordered pursuant
thereto.

235
236
237
238
239
240
241
242
243
244
245

(6) All extra expenses (including insurance costs) involved in discharg-
ing cargo at the loading port or in reaching or discharging the cargo
at any port as provided in Clauses 4 and 5 (b) hereof shall be paid
by the Charterers and/or cargo owners, and the Owners shall have
a lien on the cargo for all moneys due under these Clauses.

246
247
248
249
250

251
252

17.  GENERAL ICE CLAUSE
Port of loading

(a)In the event of the loading port being inaccessible by reason
of ice when vessel is ready to proceed from her last port or at any
time during the voyage or in vessel's arrival or in case frost sets in
after vessel's arrival, the Captain for fear of being frozen in is at
liberty to leave without cargo, and this Charter shall be null and
void.

253
254
255
256
257
258

(b) If during loading the Captain for fear of vessel being frozen in,
deems it advisable to leave, he has liberty to do so with what cargo
he has on board and to proceed to any other port or ports with
option of completing cargo for Owners' benefit for any port or ports
including port of discharge. Any part cargo thus loaded under this
Charter to be forwarded to destination at vessel's expense but
against payment of freight, provided that no extra expenses be
thereby caused to the Receivers, freight being paid on quantity
delivered (in proportion if lumpsum), all other conditions as per
Charter.

259
260
261
262
263
264
265
266
267
268

(c) In case of more than one loading port, and if one or more of
the ports are closed by ice, the Captain or Owners to be at liberty
either to load the part cargo at the open port and fill up elsewhere
for their own account as under section (b) or to declare the Charter
null and void unless Charterers agree to load full cargo at the open
port.

269
270
271
272
273
274

(d) This Ice Clause not to apply in the Spring.
Port of discharge

275
276

(a) Should ice (except in the Spring) prevent vessel from reaching
port of discharge Receivers shall have the option of keeping vessel
waiting until the re-opening of navigation and paying demurrage, or
of ordering the vessel to a safe and immediately accessible port
where she can safely discharge without risk of detention by ice.
Such orders to be given within 48 hours after Captain or Owners
have given notice to Charterers of the impossibility of reaching port
of destination.

277
278
279
280
281
282
283
284

(b) If during discharging the Captain for fear of vessel being frozen
in deems it advisable to leave, he has liberty to do so with what
cargo he has on board and to proceed to the nearest accessible
port where she can safely discharge.

285
286
287
288

(c) On delivery of the cargo at such port, all conditions of the Bill
of Lading shall apply and vessel shall receive the same freight as
if she had discharged at the original port of destination, except that if
the distance of the substituted port exceeds 100 nautical miles, the
freight on the cargo delivered at the substituted port to be increased
in proportion.

289
290
291
292
293
294

6

## RIDER TO THE CHARTER PARTY

*Clause 18:*
Owners guarantee to perform the voyage with Single Decker self trimming bulk carrier each min 20 mtons deck cranes max 25 years old which has clear and unobstructed main holds. For safety reasons simultaneous operation of two cranes at the same hold not permitted. Owners guarantee that vessel will be classed by highest 1A1 Class or equivalent society,full H+M insured and P&I covered  during the currency of this charter. Performing vsl is fully, completely workable ,suitable for charter party cargo and intended voyage.
Vessel not to change her owners,management,operation,class,P&I,H&M company without charterers written confirmation.Vsl has to be no relation with Cyprus. Otherwise owners fully responsible from the consequences resulting fm this relation

*Clause 19:*
Vessel has no arresting order,debts,lien,loan,levies,distraint that will object currency of this charter party.In case of any failure due to arising such kind of trouble owns to be fully  responsible for all looses,expenses, delayings that will effect chrtrs trading.

*Clause 20:*
At load port(s) Notice of Readiness to be tendered during from 8:00am to 17:00pm from Monday to Friday and from 08:00am to 12:00pm on Saturday included with 24 hours turntime unless sooner commence basis notice of readiness tendered.

At discharge port(s) Notice of Readiness to be tendered during from 08:00am to 17:00pm hrs Sunday and holidays included with 18 hours turntime basis(or 10 hours turntime at 1 $^{st}$ discharging port and 8 hours turntime at 2 $^{nd}$ discharging port,if any)unless sooner commence basis notice of readiness tender.

If the vessel arrives before commencement of layday then time not to count as laytime.

Time is ceased after completion of loading or discharging.

At load and discharge port NOR could be tendered by cable / telex / radio whether vessel is in the port or not / in berth or not / in free pratique or not / custom cleared or not, provided vessel is an arrived ship within anchorage limits of the port(s).

All times lost waiting for berth is to count as laytime except if the vessels occupying berth is delayed due to weather, then time lost during such period(s) is (are) not to count. Time used in shifting from anchorage to load / discharge berth is not to count.

All time lost awaiting tide at loadport is not to count as laytime.

*Clause 21*
Vessel / Owners to give Charterers' broker and agents at loadport cable advised of Notice of Arrival for 7/4/3/2/1 days. Owners to give Charterers' broker and agents 7/4/3/2/1 days notices of ETA prior arrival discharge port.
Notice parties
CargoServicesIstanbullltd.
Mail:cargo@tnn.net

Phone +90 216 4455095
Fax    +90 216 4455094
Telex +29190 or 29401

LBH CHINA (as L/P agent)
Mail: info@lbhchina.com
Tel: 8621 68880285
Fax: 8621 68880287
Comtex tlx (051)94076798

Aksoy Shipping Istanbul (as D/P agent)
Mail:agency@aksoyshipping.com
Phone:+90 216 4455095
Fax:+90 216 4455094
Telex +29190 or 29401

*Clause 22:*
At loading port, at the average rate of   10,000 MT, Per weather working of
twenty-four (24) hours,Sundays and Holidays included basis 24 hours
turntime after notice of readiness tendered unless loading has commenced
earlier in which case actual time used to count.Loading and grab trimming
of the cargo shall be free of expense to the Owner.
At 2nd load port,if any,whether the vessel in demurrage or not laytime
commence to count after notice of readiness  which to be tendered  during
08:00am to 17:00pm Sunday and holidays included.
Owners have to check and satisfy themselves about prevailing
limitations/restrictions for load port(s)

*Clause 23:*
At discharge port,for Marmara and Nemrut the cargo to be discharged at the
average rate of   10,000MT Per weather working of twenty-four (24) hours,
Sundays and Holidays included. basis 24 hours turntime after notice of
readiness tendered unless discharging has commenced earlier in which case
actual time used to count
At 2nd discharge port,if any,whether the vessel in demurrage or not laytime
commence to count after notice of readiness  which to be tendered  during
08:00am to 17:00pm Saturday Sunday included.If the vessel arrives during
religional holidays then laytime commence to count next day at 08:00am
Owners have to check and satisfy themselves about prevailing
limitations/restrictions for discharging port(s).

*Clause 24:*
At loading port shifting expenses if any to be on Owners' account. The time
used for shifting between loading berths is to count.

At discharge port(s) shifting expenses if any to be on Owners' account. The
time used for shifting between discharge berths is to count.

During loading operations, if loading is prevented or stopped by vessel,
due to insufficient pumping of ballast, time lost not to count as laytime.

*Clause 25:*
Any taxes, dues, wharfages on cargo to be for Charterers account, on
vessel, flag, ownership and freight to be for owners account.

*Clause 26:*
Demurrage and despatch in the rate stated in box 18 to be settled between
owners and main charter's within  30 banking days with balance 5% freight
after completion of discharging cargo and presentation of original

8

documents (LAYTIME CALCULATION, NOR and SOF) signed by the concerned parties.

**Clause 27:**
Vessel's holds/hatches/hatch covers to be water tight,staunch and fully eligible for all cargo operations.   Opening and closing of the hatches whenever required by Charterers, shippers, receivers or stevedores to be done by vessel's crew in owners time and expenses provided same is permitted by local regulation, otherwise for Charterers' account.     Vessel shall give necessary, power-winches as onboard free of any expense to Charterers' whenever Charteres, shippers, receivers or their servant required.

**Clause 28:**
Stevedores employed by Charteres shall be considered as subject to    orders and supervision of the Master.   Charterers not to be responsible for any negligence, default or errors in judg     ement of Stevedores employed. Stevedores damage if any, to be settled directly between Stevedores and Owners.

**Clause 29:**
Owners to have all cargo spaces clean, swept ,dry, and free of any articles of previous voyage and must be to satisfaction of shippers otherwise time lost to be for owners account.Owner warrant tank tops     suitable for grab discharge. In case of any dispute which arise due to hold cleaning mutually independent survey would be appointed and his finding /decision to be bind both parties finally.

**Clause 30:**
No cargo to be stowed in bridge spaces inaccessible to mechanical grab for loading and discharging .Any extra expenses incurred in loading by reason of stowage of in inaccessible places to  be for account of the vessel.Any time lost over and above the usual time required for grab loading and discharging is not to count as laytime.

**Clause 31:**
New Jason Clause, New Both-to Blame Collision Clause ,P&I Bunker Deviation Clause and Force Major Clause attached hereto are to be considered fully incorporated as part of this Charter Party. General Average to be settled in London and York Antwerp rules 1974 latest ammendments to be applied.

**Clause 32:**
After completion of discharging sweeping by brooms and cleaning of holds to be for the Owner's expenses and time used not to be count.

**Clause 33:**
Bimco Standard Law&Arbitration Clause 1998
English Law, London Arbitration

This contract shall be governed by and construed in accordance with english law and any dispute arising out of or in connection with this contract shall be referred to arbitration in london in accordance with the arbitration act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this clause.
The arbitration shall be conducted in accordance with the london maritime arbitrators association (lmaa) terms current at the time when the arbitration proceedings are commenced.
The reference shall be to three arbitrators. a party wishing to refer a dispute to arbitration shall appoint its arbitrator and

9

send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitration shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor counterclaim exceeds the sum of usd50,000 (or such other sum as the parties may agreed) the arbitration shall be conducted in accordance with the lmaa small claims procedure current at the time when the arbitration proceedings are commenced.

**Clause 34:**
The vessel to load and discharge at all hatches simultaneously with own gear at her regular /reasonable working speed through per hatch however the vessel shall always give free use of winches/derricks/cranes up to their mentioned lifting capacities and to supply all running gears ,falls and runners and other necessary equipment as well as sufficient power day and night and provide for sufficient light on deck and holds for night works all if /when and where required free of charge.

Vessel has minimum 20 mtons deck cranes safety lifting capacity. Owners certify that all cranes on board in good working condition and capable of discharge tonnage as mentioned by their normal speed .Any time lost by reason defective gears /equipment to breakdown of same to be added to Laytime pro-rata to the number of cranes/derricks/winches or insufficient power to drive same not to count as laytime even if vessel is already on demurrage pro-rata the number of cranes/derricks /winches.Any crane breakdown to be declared in the statement of facts.

Charterers/Shippers/receivers have right to use bulldozers, forklifts, vinches, hubes etc. to use in holds which's weight not to exceed tank top strenght as well.

At load/discharge port(s), charterers have option to use vessels grabs which are free of charge to charterers.In case of any dispute which arise due to capacity of cranes in that case mutually independent survey to be appointed and his decision/and his finding to be bind both parties

**Clause 35:**
Charterers agents are imperative and to be used at both ends, owners to pay all port charges at loading and discharging port(s) as usual. But always official tariff to be applied.
Proforma disbursement amount at loading port (s) and discharging port(s) will be remitted by owners directly to loading port and discharging port agents.Charterers are not responsible if there is any delay,penalties due to delay payment or non payment of disbursement account

**Clause 36:**

10

During the currency of this charter party, carriers shall procure that both the vessel and "the company" (as defined by the ism code) shall comply with requirements of "ism code". Relevant document of compliance (doc) and safety management certificate (smc) to be available on board    otherwise provided in this charter party, any loss, damage, expense or delay caused by the failure on the part of the owners or "the company" to comply with the ism code shall be for owners' account.

**Clause 37:**
Overtime for account of the party ordering it ,but officers and crews overtime always to be for the account of the vessel.    If ordered by Port Authority, cost of same to be On charterers/shippers/receivers account.

**Clause 38:**
Owners to guarantee that vessel complies with all laws and regulations in the trade vessel will be employed in during the duration of this C/P and all time vessel has original valid certificates on board and vessel has no objection to call ports and trade to countries specified in this charter party.In case of any failure due to arising such kind of missing and owns to be fully responsible for all looses, expenses, delayings. Owners also guarantee all stability booklets are correct and vessel suitable for the sufficient draft survey.

**Clause 39:**
CONGENBILL  will be used and to be signed by master.Bills of Lading to be marked " Freight payable as Per Charter Party dated ............to............." and "Clean on Board" in charterers option. Bill(s) of lading quantity is to be determined by draft survey held at loading port. Freight to be paid 95 percent less commission within 4 banking days after completion of loading and signed and released of Bill(s) of Lading but in any case before breaking bulk to bank account nominated by owners.
For 2nd discharging port,if any,geographical rotation to be used. Freight deemed earned upon completion of loading, discountless and non-returnable, vessel and/or cargo lost or not lost.

**Clause 40:**
Draft survey always Charterers' account but time not to count as laytime.Master has to supervise in both ports.

**Clause 41:**
Trimming operation will not be carried out and only grab trimming will be performed at loading port. Grab trimming at loading port will be made under master's supervision and satisfaction. Master shall convey necessary protest against shippers/agents/servants for the improper trimming and shall keep Charterers informed prior signing B/L. Otherwise owners can not claim dead freight or to accept payment according to actual load as Per draft survey.

**Clause 42:**
If necessary, chrts might change original bs/l due to selling of the cargo to the third parties in order not to face any problem to discount l/c and discharge cgo.
First set of original b/ladings will be surrendered to master upon vsls arrival or local office in Turkey or owners protective agent ,for cancellation, by charterers and  owners have to give authorisation ,after receipt of new sets of draft b/ladings by fax,to concern party which chrtrs

11

appoint, for issuing/signing new sets of original b/ladings upon owners relevant p&i wording for loi form has been signed and stamped by chrtrs

**_Clause 43:_**
Charter party terms shall always supersede bills of lading terms, whenever contradictory, typewritten clauses or amendments shall principally overrule the printed text of the GENCON C/P.

**_Clause 44:_**
Vessel's description :


**_Clause45:_**
Owner have to check and confirm the attached drawings at IzmitBay port.

**_Clause 46:_**
Owners have to provide "No objection certificate" from headowners for freight/deadfreight/demurrage payment.


**_Clause 47:_**
Owners name which is written at charter party to be inserted at bills of ladings accordingly as Carriers.

**_Clause 48:_**
All Questionaire should be replied by owners completely and definitely correct and on time.Otherwise owners are fully responsible if any problem, expense,delay etc. occurs due to unanswered,incorrect of any questionaire item which are herewith attached.

**_Clause 49:_**
Negotiations and fixture is to be kept strictly private and confidential.


                                       **CHARTERERS**

        **OWNERS**

## BOTH TO BLAME COLLISION CLAUSE
================================

If the liability for collision in which the vessel is involved while performing this Bill of Lading fails to be determined in accordance with the laws of the England , the following clause shall apply.
If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners insofar as much loss or liability represents loss of, or damage to or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Carrier.
The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

## NEW JASON CLAUSE
==================

In the event of accident danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and  any salvage and special charges there on shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

## FORCE MAJEURE CLAUSE
=====================

The acts of God, public enemies, the restraints of rulers, princes and people, strike or lockouts of crew, pirates, robbers and arrests, fire on land or sea and accident of the sea, river, machinery, boilers, navigation and latent  defects in the hull or machinery or whatever nature or  kind mutually expected.
Strikes or lockouts of workmen at the mines or shippers factory or railways or barges at the loading or discharging port or elsewhere, war or effects of war, revolution, civil commotion, breakdown on or stoppage of railways or barges, or lighters or the Suppliers of cargo, now hereafter under contract, stoppage or destruction of goods in transit, yellow fever or other epidemic, frost, fire, cyclones, tempests, inundation's, earthquakes, unavoidable accidents to machinery or boilers, or other unavoidable hindrances in mining, transporting, loading, discharging or receiving the material or goods, restraints of established authorities and any other causes or hindrances happening without the fault of the Charterers shippers or suppliers of cargo, prevention or delaying the mining or manufacturing, supplying, loading, discharging or receiving of the cargo are expected and neither Charterers nor shippers shall be liable for any loss or damage resulting from any such excepted causes and time lost by reason thereof shall not count as laydays or days on demurrage. The same shall apply to any delay caused by the ship or crew.
In the nature of things governments rule in their own right and everyone else has to adapt or suffer the consequences. It follows that in cases where a government imposes  restrictions on import or export the one of the parties to a contract may be entitled to declare the contract frustrated.
A contract of carriage may be frustrated either by a supervening event which makes its performance, or continued performance impossible, or by an interruption which so delays the performance of the contract that the identity of the work or service, when resumed, with the work or service, when interrupted, ,charterers,shippers,receivers, are not responsible in case of cancelling the contract.

## PROTECTION  INDEMNITY BUNKERING CLAUSE

The vessel in addition to all other liberties shall have liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever whether such ports are on or of the direct and/or customary route or routes to the ports of loading or discharge named in this Charter Party and there take oil bunkers in any quantity in the discretion of owners even to the full capacity of fuel tanks, deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

13

## ISPS Clause for Voyage Charter Parties

(A) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(B) (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and any other information the Owners require to comply with the ISPS Code.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account and any delay caused by such failure shall be compensated at the demurrage rate.

(C) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code, the following shall apply:

(i) Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code.

(ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code shall count as laytime or time on demurrage if the Vessel is on laytime or demurrage. If the delay occurs before laytime has started or after laytime or time on demurrage has ceased to count, it shall be compensated by the Charterers at the demurrage rate.

(D) Notwithstanding anything to the contrary provided in this Charter Party, any additional costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(E) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

08/01/2005  20:19  5006367257    SMIMA WH VOSS    NO.7491  P. 13  PAGE  14
Aug. 1. 2005  1:58PM  PHOENIX BULK CARRIERS

FOLLOWING QUESTIONAIRE TO BE REPLIED BY OWNERS AND ALL
INFORMATIONS HEREBELOW, TO BE INCORPARETED INTO OUR CHARTER
PARTY.

A) FULL DESCRIPTION
B) POCKET PLAN
C) HOLDS/HATCHES FULL BREAKDOWN
D) GEAR CAP, SWL, OUT REACHING, CYCLE PER HOUR, GEAR TYPE
   (ELECTRICAL, HYDROLIC OR ELECTRO-HYDROLIC)
E) DRAFT (WINTER, SUMMER, TROPICAL) IN BALAST AND LADEN.
F) MMSL, IMO NUMBER, CO2 FITTED OR NOT
G) FLAG, BLT YEAR, CLASS, PANDI, ISM SOCIETY, H+M VALUE AND COMPANY
H) LAST DD, NEX DD, LAST SS, NEXT SS
I) SATCOM FITTED OR NOT IF YES PLS ADVS NUMBERS.
J) PRESENT POSITION, ITINERARY, BEST ETA TO LOADPORT
K) LAST PORT'S AGENT'S FULLSTYLE
L) LAST 5 CGOES
M) REGISTERED OWNS, DISP OWNS, OPERATORS, MANAGERS FULLSTYLE,
   DOMICILE
N) WHOSE ACCT FRT TO BE REMITTED
O) UPON FIXING ON MAIN TERMS OWNS TO SEND WRITTEN CONFIRMATION
   FROM H+M COMPANY AND PANDI CLUB THAT VESSEL HAS BEEN COVERED
   BY INSURANCE AND PANDI.

08/01/05  MON 20:17  [TX/RX NO 7147]