UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
PHOENIX BULK CARRIERS LTD.,

               Plaintiff,

    -against-

UNICARBON LIMITED and
DYNACOAL LIMITED,

               Defendants.
----------------------------------------------------------x

**07 Civ. 10404 (RMB)**

## MEMORANDUM OF LAW IN
## OPPOSITION TO MOTION TO VACATE

Of Counsel:

FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiff
Phoenix Bulk Carriers Ltd.
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 Fax
Peter J. Gutowski (PG 2200)
Pamela L. Schultz (PS 8675)

## PRELIMINARY STATEMENT

This Memorandum is submitted on behalf of the Plaintiff Phoenix Bulk Carriers Ltd. ("Phoenix" and/or "Owner") in opposition to the motion filed by Global Coal Trade Co. ("Global Coal") to vacate an attachment of funds in connection with a claim for breach of contract of charter party. For the reasons outlined below, Global Coal has carefully hidden from the Court the true facts relating to the underlying carriage and the Defendants' interest in the attached funds and the application to vacate should be summarily rejected, and consideration given for sanctions against Global Coal for having purposely shielded the Court from these relevant facts.

## BACKGROUND FACTS

In order to put this application in context, the Court is respectfully referred to the detailed Coll Declaration which provides the full background to this situation and the basis upon which the restrained funds represent an asset in which the Defendant has an interest. To the extent there is no need to repeat those same facts here, a detailed review is not set forth in this memorandum, save for the following brief summary.[1]

By way of background, Defendant Dynacoal is a shell BVI company that is controlled and manipulated by Mr. Mizracki, the individual who signed the declaration on behalf of Global Coal. Mr. Mizracki runs several coal companies in Turkey (which all operate under similar names with the lead company being Enerji Maden). Mr. Mizracki purchases and imports his coal through a series of shell entities based in the BVIs including Dynacoal.

---

[1] Before doing so, however, it is important to note that Global Coal (Mr. Mizracki) raises no challenge to the underlying contract, claim or legitimacy of the damage sought.

1

In this particular transaction, Dynacoal was the purchaser under an FOB contract with the Chinese supplier which obliged Dynacoal to arrange for the ocean carriage. Dynacoal went out into the market in its own name to charter the vessel in early December, but at about the same time, Mr. Mizracki became aware of this attachment in New York (a small sum was frozen in the name of Dynacoal) so at the last moment, he switched Dynacoal out of the charter and inserted another one of his BVI shell companies (Global Coal) as nominal charter so that when he paid the freight to the owners, that freight would not be attached.

What Mr. Mizracki did not anticipate, however, was that the Plaintiff would be able to secure a copy of the bill of lading which is attached as Exhibit H to Mr. Coll's Declaration. The bill of lading shows Dynacoal is in fact the receiver and thus the payment of the freight to the owner is for its benefit because the cargo is being carried to Dynacoal in Turkey. Under these circumstances, the payment of debt for the benefit of the defendant clearly presents the transfer of funds in which it has an interest.

Although the remaining factual points are covered in the Coll Declaration, it is also worthy to mention that Mr. Mizracki maintains the position of board chairman, majority shareholder or controlling interest in all the companies within the Group described in the Coll Declaration. They all operate collectively from the same business address at Buyukdere Cad, Akabe Is Merkaezi No: 78-80 Kat.4, Mecidiyekoi, Istanbul, Turkey, and there is no presence at all in the BVIs for the shell entities like Dynacoal (and now Global Coal) who are all operated from the Istanbul offices.

NYDOCS1/298217.1

## ARGUMENT

## POINT I

## PLAINTFF HAS MET ITS BURDEN TO SHOW WHY THE ATTACHMENT SHOULD BE MAINTAINED

It is common ground that, at an E(4)(f) hearing, the burden is on the plaintiff to demonstrate why the attachment should not be vacated. Rule E does not specify what form the post-attachment hearing must follow and the nature and scope of the hearing depends upon the issues in controversy. *Salazar v. The Atlantic Sun*, 881 F.2d 73, 79 (3d Cir. 1989); *Linea Naviera de Cabotaje, C.A. v. Mar Caribe de Navigacion, C.A.*, 169 F.Supp.2d 1341, 1357-59 (M.D.FL. 2001) ("Rule E does not restrict review [at the post attachment hearing] to the adequacy of the allegations in the complaint, nor does it echo the standards of the initial attachment that conditions appear to exist; rather Rule E requires plaintiff...to show why the attachment should not be vacated"). The standard generally is that "the plaintiff must demonstrate that 'reasonable grounds' exist for the attachment." *Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd.*, 05-7955, 2006 U.S. Dist. LEXIS 77033, *7-8 (S.D.N.Y. Oct. 23, 2006) (citation omitted). The case law of this Circuit, however, is clear that the burden of proof at this stage of the proceedings does not require the plaintiff to demonstrate its case with the same level of proof as required at trial. *Wajilam Exports*, 2006 U.S. Dist. LEXIS 77033, *9. Instead, to sustain its burden on a motion to vacate, plaintiff only needs to demonstrate the three items required under Rule E(4)(f): 1) that the cause of action arises within the Court's admiralty jurisdiction; 2) the defendant cannot be found within the district; and 3) the defendant has property within the district that has been restrained. *See Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263, 268 (2d Cir. 2002) and *Aqua Stoli Shipping Ltd. v. Gardner Smith PTY*, 460 F.3d 434 (2d Cir. 2006).

3

Significantly, it is clear that the concept of property within the purview of Rule B is of expansive scope. *Winter Storm*, 310 F.3d at 276 (property suitable to attachment under Rule B is "tangible and intangible" and includes debts owed to defendant, even those that have not yet fully matured so long as defendant's entitlement to the credit or interest in the debt is clear). Here, Global Coal's sole challenge to the attachment is the self-serving statement that it has no involvement with the Defendants and is simply a charterer of a vessel, which is utterly misleading. As more fully set forth in Point II herein below, Global Coal's position is without merit, as even the limited evidence demonstrates that it was satisfying a debt owed by Dynacoal. Global Coal's utter silence concerning the facts surrounding the underlying transaction is revealing and demonstrates the propriety of the attachment.

## POINT II

### THE ATTACHMENT SHOULD BE MAINTAINED BECAUSE GLOBAL COAL WAS TRANSFERRING FUNDS ON BEHALF AND FOR THE BENEFIT OF DYNACOAL

In <u>Winter Storm</u>, the Second Circuit emphatically acknowledged that the concept of property for purposes of Rule B was broad. Judge Haight stated:

> Initially examining admiralty law, as we must, we encounter Rule B(1) itself, which provides that a maritime plaintiff may "attach the defendant's tangible or intangible personal property." ***It is difficult to imagine words more broadly inclusive than "tangible or intangible." What manner of thing can be neither tangible nor intangible and yet still be "property?"*** The phrase is the secular equivalent of the creed's reference to the maker "of all there is, seen and unseen."

310 F.3d at 276 (emphasis supplied). Courts both in the Second Circuit and nationwide, in interpreting the scope of attachable property under Rule B, have invariably found that if the defendant has any form of a recognizable interest in almost any type of property, it is attachable under the Rule. This includes any goods, chattels, credits, or effects of the defendant (*Det*

4

*Bergenske Dampskibsselskab v. Sabre Shipping Corp.,* 341 F.2d 50 (2d Cir. 1965)), as well as

intangible items, such as debts, even if they have not yet matured or have only partially matured

(*Iran Express Lines v. Sumatrop, AG,* 563 F.2d 648 (4th Cir. 1977); *Cowles v. Kinzler,* 225 F.

Supp. 63 (W.D.Pa. 1963)).

Courts have also regularly found that due to the broad language of Rule B, restrictions

such as title or ownership do not control the scope of the attachment of property under the Rule.

Instead, any manner of interest in property is sufficient to permit restraint under Rule B. *See,*

*e.g., Florida Conference Association of Seventh-Day Adventists v. Kyriakides,* 151 F.Supp.2d

1223 (C.D.CA. 2001) (approving the attachment of part of a promissory note, despite the fact

that the debt was not due or payable at the time, because the promissory note evidenced a debt

which was "tangible or intangible property" under Rule B); *Linea Naviera de Cabotaje,* 169 F.

Supp.2d at 1359 (sustaining the attachment of the bank accounts of two companies arguably

related to the defendants, on the basis that there were reasonable grounds to believe that the bank

accounts were controlled by the defendant); *Trans-Asiatic Oil Ltd., S.A. v. Apex Oil Co.,* 743

F.2d 956 (1st Cir. 1984) (affirming the maintenance of an attachment of a debt owed by a third

party in Puerto Rico to the defendant); *Oil Transport Co., S.A. v. Hilton Oil Transport,* 1994

A.M.C. 2817 (S.D.Tx. July 25, 1994) (permitting attachment of arbitration award rendered in

New York in favor of defendant).

In recognition of the Second Circuit's expansive interpretation of the term "property"

under Rule B, this Court directed the issuance of Process of Maritime Attachment and

Garnishment against the property of the Defendant Dynacoal as follows:

> **O R D E R E D** that the Clerk of this Court is directed forthwith to issue the Amended
> Process of Maritime Attachment and Garnishment in the form annexed hereto for **seizure of all**
> **tangible and intangible property of the Defendant, as described therein, including but not**
> **limited to any transfer of freight in connection with the vessel "BRIGHT ZHEJIANG" and**

5

**any property of the Defendants (hereinafter "ASSETS"), as may be held, received or transferred in its own name or for its benefit** at, moving through, or within the possession, custody or control of banking institutions and/or other institutions or such other garnishee(s) on whom a copy of the Process of Maritime Attachment and Garnishment may be served, up to the total amount of **$1,088,909.14** pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure in respect to the claim against the Defendant, as identified in the Verified Complaint and as specified in the Process;

Similarly, the Process of Maritime Attachment and Garnishment issued by the Clerk

provided, in pertinent part, for the restraint of:

all assets, cash, funds, escrow funds, credits, wire transfers, electronic fund transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, or any other assets of, belonging to, due or for the benefit of Defendants including but not limited to **any transfer of freight in connection with the vessel "BRIGHT ZHEJIANG" and such assets as may be held, received or transferred in either of their own names or for their benefit, at, moving through,** or within the possession, custody or control of banking institutions including but not limited to: ABN Amro (emphasis supplied).

Here, a garnishee bank restrained that precise freight transfer in connection with the vessel identified in the process because that was the freight payment being made for the benefit of the Defendant Dynacoal for the shipment from the Chinese supplier as detailed in the accompanying Coll Declaration (*See* Coll at ¶'s 64-96 and Exhibit G, the actual bill of lading showing Dynacoal as consignee and receiver).

Remarkably, the declaration of Mr. Mizracki sheds no light on the transaction underlying the remittance of funds. Are we to believe that out of the goodness of Global Coal's heart it opted to carry Dynacoal's cargo from China for free, volunteering to pay the owners?

His failure to provide any background of the true nature of the transaction, and his reliance on the "plain vanilla" description provided in his declaration underscores the subterfuge that he was attempting to visit on the Court.

There is no requirement that Plaintiff bring a suit against Global Coal (or Mr. Mizracki for that matter, or his Turkish coal importing entities) or demonstrate that they are alter egos for

6

Dynacoal to be able to attach the "property." *See International Ocean Way Corp. of Monrovia v. Hyde Park Navigation, Ltd.*, 555 F. Supp. 1047 (S.D.N.Y. 1983). There, the defendant's subcharterer placed funds in a bank escrow account "for the benefit" of the defendant, which escrow account served as security for the claim defendant had brought against subcharterer in London arbitration proceedings. Subsequently, plaintiff attached the escrow account pursuant to a Rule B attachment order it had obtained against the defendant. In confirming the validity of the attachment, Judge Weinfeld ruled that "the escrow account is tangible personalty deposited *for the benefit of defendant*, subject only to the arbitrator's finding regarding the exact amount owed to defendant by its subcharterer." 555 F. Supp. at 1048 (emphasis supplied). Clearly, the funds in the escrow account were subcharterer's property, not the defendant's. If the London arbitrator ultimately determined that the subcharterer had no liability to the defendant, the escrowed funds would revert to the subcharterer. The dispositive fact, however, was that the funds were escrowed specifically for the defendant's benefit, *i.e*, the defendant had the necessary proprietary interest in the escrowed funds.

An issue very similar to the one presented in this case was addressed by Judge Pauley in *Essar v. Mar Trade*, 2007 AMC 2017 (copy attached), where he found that the payment for the benefit for another was attachable. That case is on all fours with this situation because, as outlined above it was Dynacoal's cargo that was being carried, Dynacoal was the consignee, it had the obligation to pay the freight and the introduction of Global Coal was a subterfuge. Even if Global Coal could show that it was a legitimate charterer, that payment, being made for the benefit of Dynacoal's carriage of cargo was for Dynacoal's benefit and is therefore attachable property in connection with this claim against Dynacoal.

7

A similar conclusion was reached by Judge Preska in *Losinjka Plovidba v. Azelie Corp.*, No. 06 13627 (S.D.N.Y. January 29, 2007) (copy also attached). There, defendant Azelie had a debt (charter hire payments) with non-party Sohtorik and the agreement between Azelie and Sohtorik required that the charter hire payments owed to Sohtorik be made to non-party Hellas. Azelie instructed co-defendant and corporate affiliate Cargobulk to pay Hellas $403,000 to satisfy Azelie's debt to Sohtorik. As the funds were transferred by Cargobulk to Hellas, they were restrained pursuant to a Rule B writ of attachment. In moving to vacate the attachment, Cargobulk argued that the captured funds did not belong to Azelie and therefore were outside the scope of the order and writ of attachment. Judge Preska rejected the argument and permitted the attachment to be maintained:

> The first question on the table was whether *Azelie has a property interest in the attached funds*. It seems pretty clear that Azelie chartered the M/V EBER from Sohtorik. The agreement between those two parties required that payments made by Azelie be made to Hellas. By December 5, 2005 *Azelie had a debt to Sohtorik* for, among other things, charter hire for the M/V EBER in the amount of some $403,000. *Azelie instructed Cargobulk . . . to pay Hellas the $403,000 in satisfaction of Azelie's debt to Sohtorik.* As those funds were transferred, that money transfer was captured pursuant to the order in this action. *The question on the table, as I mentioned, is whether or not Azelie has a property interest in those funds*. Here, it's clear first of all that under the rule, property interests attachable have been broadly defined . . . . Here, the undisputed fact that *the payment was made on behalf of Azelie by Cargobulk seems to represent a sufficient property interest to be attached within the meaning of the rule* . . . . Accordingly, I find that Azelie had a property interest that could properly have been attached in the funds. (citations omitted; emphasis supplied).

While presumably, we will not be able to obtain Dynacoal's acknowledgement that the payment was being made for its benefit (at least not before tomorrow's hearing), how is Global Coal (Mr. Mizracki) going to explain away the fact that it was Dynacoal that entered the market in December as the charterer (*See* Exhibit G and Coll Declaration at 62-78), and the fact that it was Dynacoal who was identified as the receiver/consignee under the subject bill of lading

(Exhibit H) for which freight obviously had to be paid to the owner of the vessel in exchange for the carriage of the coal to Dynacoal in Turkey.

Accordingly, Plaintiff respectfully submits that Dynacoal possesses the necessary proprietary interest in the freight payment, the attachment is proper and should be maintained. Global Coal's motion to vacate should therefore be denied in all respects.

## POINT III

### PLAINTIFF SHOULD BE PERMITTED TO TAKE LIMITED DISCOVERY CONCERNING THE BUSINESS RELATIONSHIP AMONG THIS GROUP IN RESPECT OF THE VOYAGE OF THE BRIGHT ZHEJIANG AND THE PURCHASE OF THE CARGO

Plaintiff respectfully requests that in the event the Court opts to entertain an argument that Dynacoal has no interest in the attached funds, Plaintiff should nevertheless be permitted to conduct specific and limited discovery regarding the commercial dealings among the entities operated by Mr. Mizracki in this "Group". *See Maryland Tuna Corp. v. MS Benares*, 429 F.2d 307, 322 (2d Cir. 1970) (discovery permitted in respect to allegation that assets owned by one corporation should in fact be considered an asset of a related corporation); *Rolls Royce Ind. Power (India) v. M.V. FRATZIS M*, 1996 A.M.C. 390, 392 (S.D.N.Y. 1995) (Haight, J.) (discovery allowed on motion to vacate attachment to determine whether attachment reached assets of the named defendant).

This argument is all the more compelling here, as it is evident from the initial indications sent out when Mr. Mizracki was seeking a vessel, that Dynacoal was going to be the charterer. *See* Coll Declaration at ¶'s 62-78 and Exhibits G & H).

The issue of whether the attachment is proper and provides a basis for *quasi in rem* jurisdiction is an issue which only the Court can decide based upon all the facts. If an entity like

9

Global Coal (Mr. Mizracki) could come into the Court with its own self-serving declaration and secure vacatur of attachment on the basis of its version of the story, every attachment would be vacated on this basis. The Second Circuit has made clear that this would be inappropriate and discovery should be allowed to test the position, and in the circumstances of Mr. Mizracki's Declaration patently clear. Plaintiff respectfully submits that it should be entitled to conduct limited discovery on this specific transaction.[2]

## CONCLUSION

For all the foregoing reasons, Plaintiff respectfully requests that this Court deny Global Coal's motion, direct that the challenged attachment remain in place, and award such other and further relief as the Court may deem just and proper.

Dated: New York, New York
        January 31, 2008

FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiff
PHOENIX BULK CARRIERS LTD.

By: _____
        Peter J. Gutowski (PG 2200)
        Pamela L. Schultz (PS 8675)
        80 Pine Street
        New York, NY  10005
        Telephone:  (212) 425-1900
        (212) 425-1901 Fax

TO:    Patrick Crilley, Esq.
       Law Office of Richard A. Zimmerman
       Attorney for Global Coal
       233 Broadway – Suite 2202
       New York, NY  10279

---

[2]    Indeed, a movant like Global Coal so purposefully attempt to shield the Court from the underlying facts, and orchestrates an accelerated.

## CERTIFICATE OF SERVICE

I, PETER J. GUTOWSKI, certify that I am counsel of record for Plaintiff.   On January 31, 2008, the within Memorandum of Law in Opposition to Motion to Vacate was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys of record.

Additionally, I served by email a true and correct copy of same upon the following counsel:

> Patrick Crilley, Esq.
> Law Office of Richard A. Zimmerman
> Attorney for Global Coal
> 233 Broadway – Suite 2202
> New York, NY 10279

Peter J. Gutowski

Dated: January 31, 2008

NYDOCS1/298217.1

Judge Preska's decision.txt

1

71TALOSDps
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  LOSINJKA PLOVIDBA,
3
4
4              Plaintiff,
5
5         v.                              06 CV 13627 (LAP)
6
6  AZELIE CORPORATION and
7  CARGOBULK PTE LTD.,
7
8              Defendants.
8
9  ------------------------------x
9
10                                  January 29, 2007
10                                  5:40 p.m.
11
11
12  Before:
12
13                      HON. LORETTA A. PRESKA
13
14                                      District Judge
14
15
15                          APPEARANCES
16
16  FREEHILL HOGAN & MAHAR
17       Attorneys for Plaintiff
17  BY:  MICHAEL E. UNGER
18       LAWRENCE J. KAHN
18
19
19  DeORCHIS, WIENER & PARTNERS LLP
20       Attorneys for Defendant Cargobulk
20  BY:  CHRISTOPHER H. MANSUY
21
22
23
24
25

                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

⊓                                                                  2

71TALOSDps
1         (In open court; discussion held off the record)
2         THE COURT:  Counsel are here today for the second
3  round of argument on an attachment effected in early December.
4  The first question on the table was whether Azelie has a
5  property interest in the attached funds.  It seems pretty clear
6  that Azelie chartered the M/V EBER from Sohtorik.  The
7  agreement between those two parties required that payments made
8  by Azelie be made to Hellas.  By December 5, 2006, Azelie had a
9  debt to Sohtorik for, among other things, charter hire for the
10 M/V EBER in the amount of some $403,000.  Azelie instructed
11 Cargobulk, or Cargobulk was otherwise obligated by some
12 agreement with Azelie, to pay Hellas the $403,000 in
                          Page 1

Judge Preska's decision.txt

13 satisfaction of Azelie's debt to Sohtorik.  As those funds were
14 transferred, that money transfer was captured pursuant to the
15 order in this action.  The question on the table, as I
16 mentioned, is whether or not Azelie has a property interest in
17 those funds.
18        Here, it's clear first of all that under the rule,
19 property interests attachable have been very broadly defined.
20 It is also clear that in this circuit, electronic funds
21 transfers to or from a party are attachable as they pass
22 through the banks located in the court's jurisdiction.  Here,
23 the undisputed fact that the payment was made on behalf of
24 Azelie by Cargobulk seems to represent a sufficient property
25 interest to be attached within the meaning of the rule and some

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

71TALOSDps
1 of the cases from this district, for example, Hamburg Bulk
2 Carriers v. Proteinas y Oleicos, 2005 U.S. Dist. LEXIS 8009
3 (S.D.N.Y., May 4, 2005); Engineering Equipment Co. v. S.S.
4 SELENE, 446 F.Supp. 706 (S.D.N.Y. 1978).  Accordingly, I find
5 that Azelie had a property interest that could properly have
6 been attached in the funds.
7        In addition, counsel argue about whether or not
8 plaintiff has made a prima facie showing sufficient to
9 demonstrate that -- off the record.
10        (Discussion held off the record)
11        THE COURT:  Cargobulk is the alter ego of Azelie.
12 Counsel have cited particularly to Ulisses Shipping Corp. v.
13 FAL Shipping Co. Ltd., 415 F.Supp.2d 318, 322-23 (S.D.N.Y.
14 2006), and there, the Court held that at a post-attachment
15 hearing, a plaintiff asserting corporate alter egos need not
16 definitively establish dominion and control but there must present
17 enough evidence to convince the court that there are reasonable
18 grounds for piercing the corporate veil.  In that case, the
19 Court relied on a showing that one entity paid the debts of the
20 other and the two entities had overlapping ownership,
21 management, and purposes.  Here, we have a similar showing as
22 between Azelie and Cargobulk.  Indeed, much of the overlap is
23 admitted in Mr. Wong Kim Sen's declaration.  There is no
24 question here but that the $403,000 payment was attempted by
25 Cargobulk on behalf of Azelie.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

71TALOSDps
1        It also appears from the Walters declaration that
2 Azelie has no actual existence but is a corporate shell and has
3 capitalization of one Singapore dollar, or approximately 65
4 cents.
5        Off the record.
6        (Discussion held off the record)
7        THE COURT:  In addition, Mr. Wong points out in
8 paragraph 12 of his deposition, for example, that Cargobulk as
9 managers and agents of Azelie will make advance payments on
10 behalf of and on instructions from Azelie.  And he goes on to
11 say that Azelie will thereafter repay and reimburse cargo bulk.
12 However, there does not appear to be any evidence of that.
13        Given the undisputed facts of interlocking ownership,
14 common management, and the payment of debts on behalf of
15 Azelie, plaintiff at this point has made a prima facie showing
16 of an alter ego situation sufficient to demonstrate reasonable
17 grounds for piercing the corporate veil.  Accordingly, the

Page 2

Judge Preska's decision.txt

18   attachment will be continued.
19         Counsel, would you confer and let me know within the
20   week how you would like to proceed.
21         MR. UNGER:  Will do, your Honor.
22         THE COURT:  Anything else today?
23         MR. MANSUY:  Yes, your Honor.
24         THE COURT:  Yes, sir.
25         MR. MANSUY:  I'm still not clear which way the alter
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                              5
71TALOSDps
 1   ego goes.  If Cargobulk is the alter ego of Azelie, then
 2   Cargobulk capitalization is irrelevant, I think.
 3         THE COURT:  It is Azelie's capitalization that was at
 4   65 cents.
 5         MR. MANSUY:  Walters was observing something about
 6   Cargobulk's capitalization.
 7         THE COURT:  All right.  Let me find him.
 8         MR. UNGER:  That is correct, your Honor.  Mr. Walters
 9   was making that observation on the part of Cargobulk.
10         THE COURT:  Well, let me just say this, counsel.
11   Nevertheless, the material in Mr. Walters' declaration, for
12   example, paragraph 11, all of Azelie's activities appear to be
13   controlled on a day-to-day basis through Cargobulk in Singapore
14   or through others of its offices.  He goes on to give some
15   detail there.  But it does seem to me that there is certainly a
16   prima facie showing of alter ego at this point in time.
17         MR. MANSUY:  Well, there is no suggestion, and indeed
18   the management agreement says, that Cargobulk will manage the
19   affairs of Azelie.  That's not a mystery.  The question is
20   whether that is then enough to say that Cargobulk is
21   responsible for the debts of Azelie, which is what they are
22   alleging.
23         THE COURT:  Yes, sir.  Mr. Walters' detail does seem
24   to provide enough information for a prima facie showing.
25   Obviously that's not a finding at this point.
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                              6
71TALOSDps
 1         MR. MANSUY:  OK.  And I believe your Honor also
 2   mentioned that there was no evidence of remittance, I think you
 3   said there was no evidence of remittance.
 4         THE COURT:  Right.  I was referring to Mr. Wong's
 5   affidavit, sir.
 6         MR. MANSUY:  Right.  There is attached, the fifth page
 7   of Exhibit 5, the sixth page of Exhibit 5 is an e-mail
 8   reflecting the transfer of a substantial amount of money,
 9   reflecting charter payments due on other unrelated vessels.
10         THE COURT:  The fifth or the sixth?  I'm sorry.
11         MR. MANSUY:  It's two pages.  One, the first page, is
12   an e-mail dated December 1, 2006, from Cargobulk to Azelie.
13         THE COURT:  Of Exhibit 5.
14         MR. MANSUY:  Yes, to the Wong affidavit.  The last
15   exhibit is Exhibit 6.  That's two pages.
16         THE COURT:  Yes, sir.
17         MR. MANSUY:  And then the --
18         THE COURT:  The one before it is 5.
19         MR. MANSUY:  Right.  And the last two pages of Exhibit
20   5 reflect the transfer.
21         THE COURT:  Yes, sir.  December 1, 2006.
22         MR. MANSUY:  That's memorializing the transfer from
                          Page 3

Judge Preska's decision.txt
23  Azelie to Cargobulk.  And the details are shown on the
24  following page.
25                  THE COURT:  Yes, sir.  I stand corrected.  There is
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

                                                                    7
        71TALOSDps
1   some indication of reimbursement.
2                   Anything else to add?
3                   MR. MANSUY:  Just a question, your Honor.  I take it
4   from the decision you've rendered that you consider the
5   argument with regard to the plaintiff's burden of showing some
6   element of fraud as a nonstarter.
7                   THE COURT:  I do understand that to be based primarily
8   in the state law and not the federal common law.  However, if
9   we were going to pursue that, it does seem that the course of
10  negotiations set out in Mr. Magas' declaration certainly shows
11  reliance on Cargobulk and Azelie, and their agreements to pay.
12  In particular he discusses the need to move the perishable
13  cargo.  He notes that the individuals confirmed that they were
14  negotiating on behalf of Azelie except for, in his declaration,
15  Mr. Wong says that he's a Cargobulk employee.  It's clear from
16  the course of the negotiations, plaintiff's reliance on both
17  Azelie and Cargobulk for payment, the necessity of having all
18  three parties together to minimize damage, and finally the
19  conclusion in paragraphs 24 and 25.  So to the extent that that
20  additional requirement is necessary, it does seem to have been
21  met at least on a prima facie basis here.
22                  Anything else, gents?
23                  MR. MANSUY:  I would just like you to note, your
24  Honor, that in paragraph 14, Mr. Magas is actually talking of
25  the three people, as I understand it, the plaintiff, its time
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

                                                                    8
        71TALOSDps
1   charterer, Cross World, and Azelie as Cross World's
2   subcharterer.
3                   THE COURT:  13 or 14, sir?
4                   MR. MANSUY:  Yes, your Honor.
5                   THE COURT:  13 or 14 are you referring to?
6                   MR. MANSUY:  I'm sorry.  14.  I believe that that is
7   the triangle that he is speaking of.
8                   THE COURT:  Well, certainly Cross World is involved.
9   But at least as represented by Mr. Magas, the authorization was
10  both to Azelie and Cargobulk to pay the amount owed directly to
11  plaintiff.
12                  MR. MANSUY:  Well, there's no evidence in any of the
13  exhibits to his declaration of that fact, your Honor.
14                  THE COURT:  All right, sir.
15                  All right, gentlemen.  I'll look for your letter
16  within the week if you would, please.
17                  MR. UNGER:  Yes, your Honor.
18                  MR. MANSUY:  Your Honor, one thing.  Mr. Wong is out
19  of Singapore, and I had some difficulty contacting him.  I will
20  try to impress upon everybody in their office to get ahold of
21  him.
22                  THE COURT:  If you need more time, tell me.  I know
23  how difficult it is to confer with those folks 12 hours off.
24                  Thank you gentlemen.
25                              oOo
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
                                    Page 4

Judge Preska's decision.txt

**ESSAR INT'L LTD., Plaintiff, -against- MARTRADE GULF LOGISTICS, FZCO, Defendant.**

07 Civ. 3439 (WHP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2007 U.S. Dist. LEXIS 61713; 2007 AMC 2017*

August 23, 2007, Decided
August 23, 2007, Filed

**COUNSEL:** [*1] For Plaintiff: Manuel Antonio Molina, Esq., Freehill, Hogan & Mahar, LLP, New York, NY

For Defendant: Keith B. Dalen, Esq., Hill Rivkins & Hayden LLP, New York, NY.

**JUDGES:** WILLIAM H. PAULEY III, U.S.D.J.

**OPINION BY:** WILLIAM H. PAULEY III

**OPINION**

MEMORANDUM AND ORDER

WILLIAM H. PAULEY III, District Judge:

Non-party Marlog-LBG Logistics GmbH ("Marlog") moves to vacate an attachment of funds resulting from an Order of Maritime Attachment and Garnishment against Defendant Martrade Gulf Logistics, FZCO ("Martrade"). For the following reasons, Marlog's motion is denied.

BACKGROUND

On May 1, 2007, Plaintiff Essar International, Ltd. ("Essar") commenced this action seeking attachment of Martrade's assets pursuant to *Supplemental Rule B* for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("*Rule B*"). On May 2, 2007, the Court issued an Order of Maritime Attachment and Garnishment against Martrade in the amount of $ 1,327,249.78 ("the Attachment Order").

On June 1, 2007, Deutsche Bank informed Essar that it had restrained a $ 157,000 electronic funds transfer ("EFT") pursuant to the Attachment Order (the "June 1 EFT"). (Declaration of Keith B. Dalen, dated June 29, 2007 P 5.) The June 1 EFT [*2] originated with Marlog and was remitted to Inchape Shipping Services ("In-

chape"). Deutsche Bank restrained the June 1 EFT because the transaction confirmation included the description, "Grand Glory V7807 for Martrade Gulf Logistics." (Declaration of William L. Juska Jr., dated July 5, 2007 ("Juska Decl.") P 11.) The bank advised Essar that Martrade was neither the originator nor the beneficiary of the remittance, but Essar requested that the restraint be maintained, based on the transaction description in the confirmation. (Juska Decl. P 12.)

On June 29, 2007, Marlog moved to vacate the attachment of the June 1 EFT pursuant to *Supplemental Rule E(4)(f)* for *Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule E")*. This Court heard argument on the motion on July 6, 2007. At the hearing, Martrade produced an invoice from Inchape that contained the notation, "enclosed please see payment-order from mgl-dubai [Martrade Gulf Logistics] executed from marlog-account," as well as a payment order prepared by Martrade. These documents confirm that the EFT was intended as payment for a debt owed by Martrade to Inchape. (Court Exhibit 1.) Additionally, Marlog conceded [*3] that the June 1 EFT represented payment of a debt owed by Martrade to Inchape, and that the transaction had been structured to circumvent the Attachment Order. (July 6, 2007 Hearing Tr. at 9 ("[T]his transfer was effected to avoid a *[Rule] B*[] attachment. We'll stipulate to that.")

DISCUSSION

Marlog's motion is predicated on two related arguments: First, that Martrade has no property interest in the June 1 EFT for *Rule B* purposes. Second, that its property cannot be attached because it is not a defendant in this action. Both arguments are without merit.

I. Legal Standard

Page 2

2007 U.S. Dist. LEXIS 61713, *; 2007 AMC 2017

"Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated." Rule E(4)(f). The Court must vacate an attachment if the plaintiff cannot, at a minimum, show that it has complied with the "filing and service requirements of *Rules B and E.*" *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.,* 460 F.3d 434, 445 (2d Cir. 2006).

## II. Martrade's Property Interest in the June 1 EFT

*Rule B* provides, in relevant part:

> If a defendant is not found within a district ... a verified [*4] complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property--up to the amount sued for--in the hands of garnishees named in the process ... The court must review the complaint and affidavit and, if the conditions of this Rule B appear to exist, enter an order so stating and authorizing the process of attachment and garnishment.

Rule B(1)(a)-(b). The Second Circuit has stated that the definition of "property" under *Rule B* is broad. *Winter Storm Shipping, Ltd. v. TPI,* 310 F.3d 263, 275 (2d Cir. 2002) ("It is difficult to imagine words more inclusive than 'tangible or intangible' .... The phrase is the secular equivalent of the creed's reference to the maker 'of all there is, seen and unseen.'"). Thus, attachable property under *Rule B* includes debts owed to a defendant, "even if they have not yet matured or have only partially matured," as well as electronic funds in the possession of an intermediary bank en route to a defendant recipient. *Winter Storm,* 310 F.3d at 276-78. Under *Rule B,* it is also possible for more than one party to have an interest in the same property. For example, the sender and recipient of an EFT may have "overlapping [*5] property rights," rendering the EFT attachable under *Rule B* if either party is a named defendant. *HBC Hamburg Bulk Carriers GMBH & Co. KG v. Proteinas y Oleicos S.A. de C.V.,* No. 04 Civ. 6884 (NRB), 2005 U.S. Dist. LEXIS 8009 at *14, 2005 WL 1036127, at *4 (S.D.N.Y. May 4, 2005).

Citing *DS Bulk Pte. Ltd. v. Calder Seacarrier Corp.,* No. 05 Civ. 10146 (SHS), 2006 U.S. Dist. LEXIS 39242 at *7, 2006 WL 1643110, at *2 (S.D.N.Y. June 13, 2006) and *T & O Shipping, Ltd. v. Source Link Co., Ltd.,* No. 06-Civ-7724 (KMK), 2006 U.S. Dist. LEXIS 88153 at *14, 2006 WL 3513638, at *4 (S.D.N.Y. Dec. 5, 2006), Marlog argues that Martrade has no interest in the June 1 EFT. However, those cases involved only "bare assertion[s]" of a property interest. *DS Bulk,* 2006 U.S. Dist. LEXIS 39242 at *7, 2006 WL 1643110, at *2. Here, Marlog admits that the payment to Inchape was made for Martrade's benefit, and that the transfer was orchestrated to avoid the Attachment Order. [1] This establishes that Martrade had a property interest in the June 1 EFT sufficient to render it attachable under *Rule B.* See *Linea Navira De Cabotaje, C.A. v. Mar Caribe De Navegacion, C.A.,* 169 F. Supp. 2d 1341, 1359-60 (M.D.Fla. 2001) (upholding the attachment of funds nominally belonging to non-parties because the plaintiff provided evidence they were controlled by the defendant); [*6] see also *Greenwich Marine, Inc. v. S.S. Alexandra,* 339 F.2d 901, 905 (2d.Cir. 1965) ("The inherent power to adapt an admiralty rule to the equities of a particular situation is entrusted to the sound discretion of the district judge sitting as an admiralty judge.").

> 1    *T & O Shipping* is also distinguishable because the plaintiff in that case exceeded the scope of the attachment order, whereas that is not the case here. On the contrary, the Attachment Order provided that "[t]he Clerk ... is directed ... to issue ... [process] for seizure of all tangible and intangible property ... belonging to, due, or being transferred to, from, or for the benefit of the Defendant ... including but not limited to [property] as may be held, received, or transferred for its benefit." (Emphasis added.)

## III. Marlog's Non-Party Status

*Rule B* limits attachable property to that of a named defendant. "Modern conceptions of fairness ... dictate that actual notice be given to persons known to claim an interest in the property that is the subject of the action where that is reasonably practicable." *Winter Storm,* 310 F.3d at 269; see also *DS Bulk,* 2006 U.S. Dist. LEXIS 39242, 2006 WL 1643110, at *2 ("The language of *Supplemental Rule B* clearly [*7] anticipates that only a 'defendant' will be subject to an order of attachment."); *T & O Shipping,* 2006 U.S. Dist. LEXIS 88153 at *12, 2006 WL 3513638, at *4 ("*Rule B* limits the scope of an attachment to a defendant who is named in the verified complaint"). Marlog argues that, because Essar did not name it as a defendant or allege an alter-ego relationship between it and Martrade in the Complaint, it has failed to satisfy the technical requirements of *Rule B.* This Court disagrees.

A plaintiff need not aver an alter-ego relationship in the Complaint for a *Rule B* attachment to be proper. *Maersk, Inc. v. Neewra, Inc.,* 443 F. Supp. 2d 519, 527-30 (S.D.N.Y. Aug. 1, 2006) (holding that an analysis of whether reasonable grounds exist for a *Rule B* attachment is not limited to the allegations in the Complaint).

2007 U.S. Dist. LEXIS 61713, *; 2007 AMC 2017

As stated, Defendant Martrade had an interest in the June 1 EFT sufficient to uphold its attachment under *Rule B*. Accordingly, the requirement that the property attached be that of the named defendant is satisfied.

CONCLUSION

For the foregoing reasons, Marlog's motion to vacate the attachment of the June 1 EFT is denied.

Dated: August 23, 2007

New York, New York

SO ORDERED:

WILLIAM H. PAULEY III

U.S.D.J.