UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
PHOENIX BULK CARRIERS LTD.,

                Plaintiff,

-against-

UNICARBON LIMITED and
DYNACOAL LIMITED,

                Defendants.
-----------------------------------------------------------x

07 Civ. 10404 (RMB)

*SUR-REPLY* DECLARATION
of EDWARD COLL

EDWARD COLL, states as follows:

1. I have previously submitted a declaration in this action. I have since reviewed the reply submissions filed by Global Coal, including the Mizrakci Declaration and the exhibits annexed thereto. I have the following comments in response, which illustrate that the purported "sales" transaction identified therein is illusory and designed to circumvent the attachment.

**The December 3, 2007 "Sales" Contract is illusory and makes no commercial sense.**

2. In Mr. Mizrakci's Reply Declaration, he states that Dynacoal had no *"property interest"* in the payment for the coal on the vessel because it had *"already concluded a contract of sale"* with Global Coal. He submits, as Ex. H, the purported sales contract, and several other exhibits to support his allegations. That contract, however, and the additional exhibits, make absolutely no commercial sense, are contradicted by his contemporaneous actions (which he cannot explain away), and in fact reveal that the payment was for an earlier shipment purchased by Dynacoal.

3. As discussed more fully below, the documents reveal that the supposed "sale" to Global Trade, which allegedly divested Dynacoal of any interest in the funds, is no more than an in-house paper maneuver designed to give the false impression that such a sale had taken place. In point of fact, no *real* sale to Global Coal took place, and the payment on December 13 (which Mr. Mizrakci claims was payment for the subject shipment) actually relates to an earlier ***Dynacoal shipment***, not the cargo supposedly sold to Global Trade. Hence, his evidence of payment is misleading, and does not support that a bona fide sale to Global Coal had occurred, and thus Dynacoal did indeed retain an attachable interest in the payment seized. The following points bear this out:

(i) The date of the purported sales contact is contradicted by Dynacoal's efforts to charter a vessel in early December. The sale contract presented is purportedly dated December 3, 2007 (Ex H). I would submit that Mr. Mizrakci used that date in order to give the Court the false impression that the sale preceded the notification that he received of the attachment in

this case (which he received sometime after Dec 5), and thus his sale contract was just *business as usual*. But when he inserted the fake Dec. 3 date, he forgot to take into account the name he used when he entered the market to charter a ship for this cargo. On Dec 5, he went into the market, *as Dynacoal*, looking for a ship. (See, original Coll Declaration at ¶ 62-66 and Ex G, the Dec 6 inquiry *by Dynacoal* to charter a ship.) If Dynacoal had really "sold" its interest in this shipment to Global Coal on December 3, as Mr Mizrakci *now* claims, Global Coal would have been the charterer identified in the inquiry, not Dynacoal. His contemporaneous actions (i.e. seeking to charter a vessel in the name of Dynacoal after Dec 5) reveal that the date of this supposed sale contract is contrived.

(ii)   The same holds true with respect *Dynacoal's* follow-up inquiry in the market on December 12 (*see* Coll Declaration at ¶63-68 regarding Dynacoal's reiteration of its continued need for a ship in Dec.). Again, if Dynacoal had already sold the cargo to Global Coal on Dec 13, as Mr. Mizrakci now claims, why was Dynacoal still in the market for a ship to carry this cargo on Dec 13? This further illustrates that the December 3 sales contract is a fabrication, and was back-dated after the fact.

(iii)  The deal itself makes no commercial sense. Mr. Mizrakci states that Dynacoal sold the cargo to Global Coal because Global Coal saw an opportunity to make a profit. What about Dynacoal? Why did it sell the coal? The payment terms of the purported sales contract (¶ 9 of Ex H) show no profit whatsoever, and merely call for Global Coal to take over the same payment obligation to the Chinese supplier that Dynacoal otherwise had. Mr. Mizrakci offers no explanation, on this supposed arms length deal, as to why Dynacoal would sell the cargo for no profit. This is no more than a maneuver between entities controlled by Mr. Mizrakci to get Dynacoal's name out of the transaction and avoid the attachment. It's not a sale.

(iv)   The price of coal also reflects the illusory nature of this supposed "sale." According to the proffered sales contract, the price paid by Global Coal to Dynacoal ($87/ton as per Clause 5 E of Ex H) is completely out of line with the market at that time. In the first week of December, when Dynacoal *supposedly* sold the cargo to Global Coal, the going price, as reported in the Financial Times Commodities and Agricultural Publication, was $102.96 per ton FOB Qinhuangdao. But Dynacoal sold it to Global Coal for only $87 per ton, the same price Dynacoal was supposed to pay to CNCIQ. That is absurd, and defies any business logic which would support such a transaction. The difference ($15.96/ton) multiplied by the number of tons loaded, indicates that Dynacoal thus sold the cargo to Global Coal for **$1,005,719 below the current market price.** Mr. Mizrakci argues that this sale was legitimate and was done because it represented an "opportunity" – but for whom? Certainly not for Dynacoal.

(v)    The terms of the sales contract itself are nonsensical. In Mr. Mizrakci's haste to create a sales document after reading our opposition, he obviously did a cut and paste job from the real sales contract between Dynacoal and the supplier CNCIQ. By way of illustration, Clause 13 of the proffered new sales contract provides for arbitration *in Mongolia*. (*See* Ext H.) Are we to believe that these two BVI captives of Mr. Mizrakci actually agreed to Mongolian arbitration for any disputes between them?

(vi)    The numbers in the contract don't match with the subject shipment either, nor does the amount which Mr. Mizrakci *claims* that Global Coal paid to the supplier. In an effort to manufacture some proof of payment by Global Coal for the shipment, Mr. Mizracki submits, as Ex I, the instructions he supposedly sent to his bank for a payment to CNCIQ (the supplier) for *"the cargo shipped on this vessel."* (*See* Mizrakci Dec'l at ¶ 7.) That payment on Dec 13 related to a shipment of *exactly 66,091.95 metric tons* of coal. (*See* Ex I, payment order referencing precisely 66,091.95 M/T of coal, and similar representation in the wire transfer details at the bottom of page 2 of Ex I). But the subject shipment on the BRIGHT ZHEJIANG was significantly less. By Mr. Mizrakci's own admission, the shipment on the subject vessel totaled only 63,015 M/T. (*See*, the two bills of lading he now annexes as Exhibit J comprising the shipment on the BRIGHT ZHEJIANG adding up to only 63,015 M/T). Therefore, the proof of payment proffered as having been made for the subject shipment shows *a completely different and greater amount,* and simply does not match the quantity loaded on the BRIGHT ZHEJIANG. It is no proof of an actual sale divesting Dynacoal of an interest in the shipment.

(vii)   Further, if Global Coal was actually paying the Chinese supplier CNCIQ on December 13th *for the cargo on the BRIGHT ZHEJIANG,* as Mr. Mizrakci now claims, how did he know how much to pay? The ship hadn't even arrived yet, and no cargo had been loaded as of that date (see Ex. J, the purported bills of lading, showing loading not completed until December 22).

(viii)  Better still, are we to believe that this sophisticated coal trader actually paid, *in advance,* the Chinese supplier in excess of $5.75 million *before* the cargo was loaded? In 30 years of world-wide commodities trading, I have never seen anyone agree to pay cash, in advance, for a cargo before the vessel had arrived/loaded. This presents an incredible exposure because paying in advance leaves the buyer with absolutely no assurance that the cargo will ever be loaded. These transactions are simply not done this way.

(ix)    Accordingly, this supposed Dec 13th payment is either: (a) an illusory payment altogether, or (b) represents payment for a prior Dynacoal shipment of 66,091.95 M/T of cargo, and cannot represent payment for the subject cargo which, as of December 13th, had not even been loaded yet and was for a totally different amount of cargo. As such, it does not support the sale transaction upon which Mr. Mizrakci builds his entire argument, and it does not support the position that Dynacoal, by virtue of this supposed sale to Global Coal, was actually divested in its interest of the cargo, the freight or the transaction.

### No Explaination is Provided Why Mr Mizrakci Had Two Sets of Bills of Lading

4. Further, no explanation is given as to why a bill of lading was available at the load port in the name of Dynacoal (dated December 22), or how Mr. Mizrakci came up with his two new bills of lading. This will only become clear through discovery, but *we* certainly did not create that original bill of lading which lists Dynacoal as the consignee (see Ex H to my original Declaration). That original

document matches precisely with the quantity of coal which Mr. Mizracki acknowledges was loaded (*See* Exhibit J). Whether they were subsequently issued by the owners of the vessel at the request of Mr. Mizrakci in order to mask the manufactured shift of the identity of the consignee from Dynacoal to Global Coal, will only be revealed through discovery. But the evidence on ownership does indeed reflect Dynacoal's involvement at the time of loading (well past the supposed sale contract date of Dec 3) and conflicts with Mr. Mizrakci's story that Dynacoal had already "sold" its interest.

5. Mr. Mizracki's does not deny anywhere his declarations that he controls all these entities, including Dynacoal, Global Coal, Super Enerji, etc., yet he claims this was an arms length transaction. Since he controls all of these shells, however, he is in effect signing the sales contract for Dynacoal with his left hand and for Global Coal with his right. This is not an arms length deal.

6. The eventual disposition of the cargo is equally telling. Mr. Mizrakci claims that it was "sold" to his other company, Super Enerji. This comes as no surprise, as this was the entity to which Dynacoal routinely delivered all of Mr. Mizrakci's coal shipments. But the supposed mark-up price paid is almost as unusual as was the mark up supposedly charged by Dynacoal to Global Coal (which was zero!).

7. Here, Mr. Mizrakci claims that after he bought the cargo from himself (i.e. sale from Dynacoal to Global Coal) he (Global Coal) then sold part of it to himself (i.e. Super Enerji, his local captive) and the rest to himself (i.e. China Coal, another of his BVI captives) who then sold back to himself in the form of Super Enerji.

8. Here, he claims that Global Coal made a $3.00 profit per ton, and this supposedly legitimized the whole deal. The going price tells otherwise.

9. In this respect, the market for this coal in mid January was much higher than what he claims to have sold it for.

10. In his declaration, he introduces supposed sales invoices dated January 18, 2008 as evidence of these supposed downstream sales, all at $90/ton FOB. (*See* Exhibit K). At that point in time, however, the 90 day forward benchmark price assessment for this grade of coal was $102.00 FOB. Why was Global Coal now willing to sell it to Super Enerji for $12.00 below the market if these were real, arms length transactions? That is a $700,000 plus savings. Not very arms length.

11. And where are the actual sales contracts, and where is the proof of these payments, as the ship has already delivered the cargo? Are we to believe that these sales actually took place, the

cargo was delivered, and no payments were made? Such would never occur in an arms length transaction.

12. To the extent all these entities are controlled by Mr. Mizracki, the documents do not show a bona fide transaction, but rather a paper transaction manufactured after-the-fact to distance Dynacoal from this deal and avoid this Court's order.

13. Equally missing is the underlying documentation to show the original transaction:

(i) Where is the long term supply contract between Dynacoal and CNCIQ?
(ii) Where is the correspondence between Dynacoal and Global Trade under which they suddenly decided to sell/buy the cargo on December 3?
(iii) Where is the correspondence between Dynacoal, Global Trade and CNCIQ relating to the nomination of a substitute buyer?
(iv) Where are all the documents called for under Clause 10 of the proffered sales contract which requires production of commercial invoices, bills of lading, certificates of weight, etc. These documents, which in the real world of commodities sales are presented after the cargo is loaded and based on which payment in the real world is made. All these documents are curiously absent from Mr Mizrakci's presentation, and should be disclosed to the extent they really exist.
(v) Where are the fixture negotiations for the charter of the vessel?

14. Equally unbelievable is the timing of the downstream sales by Global Coal to Super Enerji and to China Coal. Are we to believe that Global Coal paid $8.963 million for freight and cargo in mid-December and yet did not even seek reimbursement from these other related entities until January 18, 2008?

15. At bottom, the Plaintiff submits that what Mr. Mizrakci has done (with his set of controlled shell entities) is to create the illusion of a sale where no such transaction took place, to avoid the attachment. We respectfully submit that his effort should be rejected because the proffered documents do not support a legitimate sales transaction, some actually appear to have been generated after the fact, and the supposed payment supporting this whole sale does not even relate to the subject shipment, but rather a prior shipment. Despite his statements to the contrary, the evidence now before this Court shows that Dynacoal does in fact have an interest in the frozen payment because there was no bona fide sale transaction, which took place before Mr Mizrakci performed his corporate slight of hand, and thus it cannot support the argument proffered.

I declare under penalty of perjury the foregoing is true and correct.

Providence, Rhode Island
February 5, 2008

_____
Edward Coll