537-07/ROSS/PLS
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
Phoenix Bulk Carriers Ltd.
80 Pine Street
New York, NY 10005
Telephone: (212) 425-1900
Facsimile: (212) 425-1901
Peter J. Gutowski (PG 2200)
Gina M. Venezia (GV 1551)
Pamela L. Schultz (PS 8675)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

PHOENIX BULK CARRIERS LTD.

                    Plaintiff,

        -against-

UNICARBON LIMITED, DYNACOAL
LIMITED, GLOBAL COAL TRADE
CO. LTD., and AYHAN MIZRAKCI

                    Defendants.
--------------------------------------------------------x

07 CIV 10404 (RMB)

**FIRST AMENDED**
**VERIFIED COMPLAINT**

        Plaintiff Phoenix Bulk Carriers Ltd.. ("PBC"), through its attorneys Freehill Hogan &

Mahar, LLP, as and for its Amended Verified Complaint against Defendants Unicarbon Limited

("Unicarbon"), Dynacoal Limited ("Dynacoal"), Global Coal Trade Co. Ltd. ("Global Coal")

and Ayhan Mizrakci alleges upon information and belief as follows:

## JURISDICTION

        1.        This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract

of affreightment ("COA").    The case also falls within the Court's admiralty and maritime

jurisdiction pursuant to 28 U.S.C. §1333. Jurisdiction is also proper pursuant to the Federal Arbitration Act, 9 U.S.C. §1 *et seq.* and/or 9 U.S.C. §201 *et seq.*

## THE PARTIES

2.     At all relevant times, Plaintiff PBC was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an agent in care of Phoenix Bulk Carriers (US) Corp. in Rhode Island.

3.     At all times relevant hereto, Defendant Unicarbon was and still is a foreign business entity duly organized and existing under the laws of the British Virgin Islands with an address at Geneva Place, 3rd Floor, P.O. Box 3175, Road Town, Tortola, British Virgin Islands.

4.     At all times relevant hereto, Defendant Dynacoal was and still is a foreign business entity fully organized and existing under the laws the laws of the British Virgin Islands with an address at the same place as Unicarbon, namely, Geneva Place, 3rd Floor, P.O. Box 3175, Road Town, Tortola, British Virgin Islands.

5.     At all times relevant hereto, Defendant Global Coal was and still is a foreign business entity fully organized and existing under the laws the laws of the British Virgin Islands with an address at the same place as Unicarbon and Dynacoal, namely, Geneva Place, 3rd Floor, P.O. Box 3175, Road Town, Tortola, British Virgin Islands.

6.     At all times relevant hereto, Defendant Ayhan Mizrakci is an individual of majority age who is a resident of Turkey and controlling individual over the Enerji Maden group (as described below) and the other defendants described herein.

## THE PARTIES

7.     On or about April 29, 2005, Plaintiff PBC entered into a COA with Defendant Unicarbon requiring three (3) shipments of coal from China to Turkey.

8.    Pursuant to the terms of the COA, Plaintiff PBC provided a vessel to the Defendant Unicarbon and the initial voyage was performed without incident.

9.    Thereafter, and in breach of the COA, the Defendant Unicarbon refused to perform the remaining two (2) voyages under the COA by declining to nominate any cargoes for those shipments, which failure of performance resulted in damages to the Plaintiff PBC in the way of lost in profits in the sums of $379,437.86 and $416,247.86 for the non-performance of the second and third voyages, respectively.

10.    Plaintiff PBC has made a demand for payment of the above sums, but no part of the loss or damage has been paid.

11.    Pursuant to the terms of the COA, all claims between the parties arising out of the COA are subject to London arbitration, with English law to apply, and the Plaintiff PBC reserves its rights to have the substantive aspects of this claim arbitrated in London.

## BASIS FOR CLAIM AGAINST DYNACOAL

12.    Upon information and belief, and after due investigation, Plaintiff submits that the Defendant Dynacoal is a successor in interest and/or alter ego of the defendant Unicarbon, and as such, is responsible for the obligations and liabilities under the above referenced COA - both entities being shell instrumentalities of a Turkish coal importing group of companies as described more fully below.

13.    On November 7, 2002, Unicarbon was created as a British Virgin Island corporate entity and was assigned Company Registration No 520059.

14.    At the time of its incorporation, Unicarbon had a share capital of only $50,000 and a registered agent in care of Aleman, Cordero Galindo & Lee Trust Limited.

3

NYDOCS1/299682.1

15.    Unicarbon provided, as its purported address, Geneva Place, 3rd Floor, P.O. Box 3175, Road Town, Tortola, British Virgin Islands.

16.    Despite its purported business presence in the BVI's, Unicarbon never had nor does it have any true business or physical presence there, and all day-to-day activities conducted by Unicarbon were actually performed by the offices of the above-referenced Turkish coal importing group generally known as Enerji Maden which is run and controlled by Mr. Ayhan Mizrakci.

17.    Enerji Maden consists of a group of coal importing entities in Turkey which are involved in, *inter alia*, the importation, processing, packaging and transportation of coal throughout Turkey.

18.    The actual corporate name of the parent entity in the group is Enerji Maden Urunleri Sanayi ve Ticaret A.S., and the parent operates two separate coal receiver entities in Turkey including:

    (i)    Super Enerji Madencilik Ins. San. Ve Tic. A.S.   ("Super Enerji")

    (ii)    Super Karbon Madencilik Ins. San. Ve Tic. A.S.  ("Super Karbon")

19.    All the entities described in the preceding paragraph (collectively referred to as "Enerji Maden") operate from the same business address located at Buyukdere Cad, Akabe Is Merkaezi No: 78-80 Kat.4, Mecidiyekoy – Istanbul, Turkey, and it was from this business address that Unicarbon, and later Dynacoal were formed and then operated and controlled.

20.    Prior to the COA in question, Enerji Maden had caused to be created the shell entity Dynacoal in the BVI's (as described above in paragraphs 11 through 14) to act in the capacity as the chartering entity in whose name coal imported for the Enerji Maden group would be transported into Turkey.

21.     The purpose behind the creation of such an offshore shell entity is to shield the true and prime movers of the product from liability for any trade debt which may be incurred in connection with the transport of the raw material (in this case, coal).

22.     Specifically, and pursuant to a supply contract with China National Coal Industry Qinhuangdao Import/Export Co. Ltd., Enerji Maden utilized Unicarbon as the shell entity in whose name coal would be imported from China and carried under chartered vessels like those nominated by the plaintiff PBC under the subject COA.

23.     At all times material hereto, however, Unicarbon functioned without adequate capital or any independent corporate existence, its business functions and operations being performed through the Enerji Maden offices, and/or brokers nominated by those offices who inserted the name Unicarbon (or derivative names as described below) as the purported entity in whose name vessels would be chartered for the importation of coal at various ports within the Sea of Marmora.

24.     In an effort to shield its true identity, Unicarbon has identified itself in other corporate forms such as "Unicarbon UK Ltd." or Unicarbon Ltd. of the UK", but investigation has revealed that no such entities existed in any jurisdiction involving the UK including Northern Ireland, Scotland, England or Wales, or at any of the offshore registries in the Isle of Man, Gurnsey, Jersey, or Alderney.

25.     After the performance of the first voyage of the COA, there was a decrease in the freight market, and in an effort extricate itself from its obligations under the COA, no nominations of cargo were made by Unicarbon for the second or third shipments giving rise to the claim as aforesaid.

26.    Shortly after the breach as described above, and through the offices of Enerji Maden, arrangements were made for a new BVI corporate shell – this one to be named Dynacoal, which was formed in the British Virgin Islands in the identical fashion to the prior formation of Unicarbon.

27.    Specifically Dynacoal was formed on September 23, 2005, again with minimal capital of only $50,000, with the same registered agent as Unicarbon (*i.e.* Aleman, Cordero Galindo & Lee Trust Limited.), and with the same bogus address previously utilized by Unicarbon – namely, Geneva Place, 3rd floor, Road Town, Tortola.

28.    Like Unicarbon, Dynacoal had no physical office or presence at that location, and instead was operated, like Unicarbon, from the offices of Enerji Maden.

29.    Dynacoal was then utilized by the Enerji Maden group as the chartering entity for the transportation and importation of coal into Turkey in the same manner in which it previously used Unicarbon, and Enerji Maden and the corporations within the group including Super Enerji and Super Karbon, control and dominate Unicarbon from the same Turkish offices as they operated Dynacoal.

30.    Further investigation with brokers in the subject coal trade have confirmed Dynacoal's position within the Enerji Maden group of companies in the same manner in which Unicarbon had previously been maintained.

31.    Following the formation of its new chartering shell Dynacoal, coal shipments being imported by the Enerji Maden group (including coal shipments for Super Enerji and Super Karbon) were booked in the name of the new successor shell entity Dynacoal so as to avoid liability for the prior debts of, *inter alia,* the Enerji Maden chartering shell Unicarbon.

32.    Dynacoal, like Unicarbon, before it, lacked any true corporate existence, was insufficiently capitalized, and maintained no distinct corporate office or presence apart from that maintained by the offices of the Enerji Maden group and should be considered as successors in interest and alter-egos of each other for purposes of the imposition of liability under the subject COA.

## BASIS FOR CLAIMS AGAINST GLOBAL COAL AND MR. MIZRAKCI

### A. Global Coal's Corporate Information.

33.    Upon information and belief, and after due investigation, Plaintiff submits that Defendant Global Coal is a successor in interest and/or alter ego of Defendant Unicarbon and/or Dynacoal, and as such, is responsible for the obligations and liabilities under the above referenced COA -- all three entities being shell instrumentalities of the Enerji Maden group of companies and operated by Mr. Mizracki interchangeably and in a fraudulent manner.

34.    Global Coal was originally created as a British Virgin Island corporate entity and was assigned Company Registration No 594596.

35.    Global Coal, like Defendants Unicarbon and Dynacoal, was formed with minimal capital.

36.    Global Coal, like Defendants Unicarbon and Dynacoal, provided as its purported business address a location similarly placed in Road Town, Tortola, British Virgin Islands.

37.    Despite its purported business presence in the BVI's, Global Coal (like Unicarbon and Dyncoal) never had and does not have any true business or physical presence there, and all day-to-day activities conducted by Global Coal are actually performed by the Turkish offices of Enerji Maden and Mr. Mizrakci.

38.    Mr. Mizrakci is, upon information and belief, the sole director of Global Coal.

39.    Mr. Mizrakci and Enerji Maden and the corporations within the group, including Super Enerji and Super Karbon, control and dominate Global Coal from the same Turkish offices as they operated Unicarbon and Dynacoal.

40.    Global Coal's BVI registration was permitted to lapse but resurrected in 2007, when Mr. Mizrakci or persons acting at his behest, arranged for it to be re-registered.

41.    After it was resurrected, Global Coal was utilized or attempted to be utilized by the Enerji Maden group and Mr. Mizrakci as the chartering entity for the transportation and importation of coal into Turkey in the same manner in which it previously used Unicarbon and Dynacoal and/or as the entity into which Mr. Mizrakci manipulated and shifted obligation of Dynacoal so as to avoid the attachment issued in this case.

42.    Further investigation including Global Coal's actions in these proceedings (discussed below) have confirmed Global Coal's position within the Enerji Maden group of companies in the same manner in which Unicarbon and Dynacoal had previously been maintained.

43.    Following the resurrection of Global Coal, coal shipments being imported by the Enerji Maden group (including coal shipments for Super Enerji and Super Karbon) were booked, attempted to be booked and/or fraudulently shifted from the name of Dynacoal into the name of Global Coal without any fair consideration so as to avoid liability for the prior debts of, *inter alia,* the Enerji Maden chartering shells Unicarbon and Dynacoal.

44.    Global Coal, like Unicarbon and Dynacoal before it, lacked any true corporate existence, was insufficiently capitalized, and maintained no distinct corporate office or presence apart from that maintained by the offices of the Enerji Maden group and should be considered as

successors in interest and alter-egos of each other for purposes of the imposition of liability under the subject COA.

## B. Mr. Mizrakci's Fraudulent Statements to this Court

45.    The fraudulent and interchangeable manner in which Mr. Mizrakci and the Enerji Maden group operates and controls Defendants is further established by their conduct in this litigation and their statements to the Court.

46.    On the filing of its original Verified Complaint in November 2007 against Defendants Unicarbon and Dynacol, Plaintiff obtained an order of attachment pursuant to Supplemental Admiralty Rule B against all assets of these two defendants.

47.    As of December 21, 2007, only a modest sum of funds had been restrained pursuant to the Court's order of attachment.

48.    Plaintiff thereafter learned that Defendant Dynacoal had chartered a vessel (the M/V BRIGHT ZHEJIANG) for the carriage of a cargo of coal from North China to Turkey, the base of operations from which the Defendants import coal for the Enerji Maden group of companies.

49.    Plaintiff suspected that since they had notice of the attachment order, Defendants would try to circumvent the Court's order by changing the name of the charterer from Dynacoal to the name of a group entity other than Dynacoal and thus masking the true identity of the party at interest with that charter, as well as the cargo and the freight payment.

50.    As such, Plaintiff sought and obtained a Court order amending the process of maritime attachment to include not only the names of Unicarbon and Dynacoal, but also any transfer referencing the freight due for the BRIGHT ZHEJIANG charter.

51. On or about January 9, 2008, a transfer of $999,965.00, representing partial payment of the freight due on the BRIGHT ZHEJIANG charter, was restrained.

52. Thereafter, Defendant Global Coal appeared in these proceedings and filed a motion to vacate the attachment, claiming that it, not Dynacoal, was the charterer of the BRIGHT ZHEJIANG and that the attachment over the freight payment should be vacated because Dynacoal supposedly had no interest in that payment or the underlying charter.

53. Plaintiff however had obtained a copy of the original bill of lading issued for the BRIGHT ZHEJIANG carriage and the bill revealed that the ultimate receiver of the cargo remained Dynacoal, which showed that it (not Global Coal) was the party who had an interest in the freight payment. (Attached hereto as Ex. A is the Declaration of Edward Coll which sets forth in more detail the facts surrounding Global Coal's effort to avoid the attachment).

54. In response, Global Coal submitted the declaration of Mr. Mizrakci which attached a contract which supposedly reflected that Global Coal had purchased the cargo from Dynacoal. The falsity of this document was revealed in several respects. (Attached hereto as Ex. B is the Reply Declaration of Edward Coll which describes the fraudulent aspects of Mr. Mizrakci's presentation and his reply declaration.).

55. Global Coal's actions in seeking to avoid the attachment and the production by Mr. Mizrakci of false documents and the submission of a untruthful statements in a sworn declaration further demonstrates that Defendants, all of whom are controlled by Mr. Mizrakci and the Enerji Maden group, should be considered as successors in interest and alter-egos of each other for purposes of the imposition of liability under the subject COA.

56. By virtue of Mr. Mizrakci's domination and control of all the entities in the Enerji Maden group including the defendants and his conduct in fraudulently seeking the release of the

attached funds, he should be considered the alter-egos of each of the other defendants named herein, for purposes of the imposition of liability under the subject COA

## RULE B MARITIME ATTACHMENT

57.    This action is brought to obtain security in favor of Plaintiff PBC in respect to Plaintiff's claims, including but not limited to the principal amount of the claim, plus interest estimated until the time of entry of judgment or an award, plus Plaintiff's anticipated attorney fees and costs in arbitration, all of which are recoverable as a part of Plaintiff's main claim under English law.

58.    After investigation, none of the Defendants can be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendants have, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, credits, debts, wire transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendants, or any of them ("ASSETS"), including but not limited to ASSETS at, through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

59.    The amount of Plaintiff's claim sought to be attached pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims by Plaintiff against Defendants is as follows:

a.    Principal outstanding in the sum of $795,685.72;

b.    Interest in the amount of $143,223.42 calculated on the sum of $795,685.72 at the rate of 6% per annum, compounded quarterly, for

three years, the estimated time it will take to obtain a final arbitration award, which interest is recoverable in arbitration under English law;

c.  Estimated costs, including legal fees, of London arbitration, which are recoverable under English law in the amount of $150,000.00.

For a total amount sought to be attached of **$1,088,909.14**

WHEREFORE, Plaintiff PBC prays:

a.  That process in due form of law according to the practice of this Court issue against Defendants, citing them to appear and answer the foregoing, failing which a default will be taken against them for the principal amount of the claim of $795,685.72, plus interest, costs and attorneys fees;

b.  That if Defendants cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendants, up to and including the claim of **$1,088,909.14**, be restrained and attached, including, but not limited to any cash, funds, escrow funds, debts, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or other assets of, belonging to, due or being transferred to, from, or for the benefit of Defendants (collectively "ASSETS"), including but not limited to such ASSETS as may be held, received or transferred in their own names or as may be held, received or transferred for their benefit at, moving through, or within the possession, custody or control of banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c.   That the order of attachment to be issued herein shall relate to and be applicable

to any funds already under restraint in this matter and have effect *nunc pro tunc* as

to those funds;

d.   That the Court enter an order directing Defendants to appear and respond in the

London arbitration as required, or, to the extent an award is rendered against the

Defendants, or any of them, to confirm that award as a judgment of this Court;

and

e.   That Plaintiff has such other, further and different relief as this Court may deem

just and proper in the premises.

Dated: New York, New York
       February 27, 2008

                              FREEHILL HOGAN & MAHAR, LLP
                              Attorneys for Plaintiff
                              Phoenix BULK CARRIERS LTD.


                   By:    _____
                              Peter J. Gutowski (PG 2200)
                              Gina M. Venezia (GV 1551)
                              Pamela L. Schultz (PS 8675)
                              80 Pine Street
                              New York, NY  10005
                              Telephone: (212) 425-1900
                              (212) 425-1901 Fax

## ATTORNEY VERIFICATION

State of New York    )
                     ) ss.:
County of New York   )

PETER J. GUTOWSKI, being duly sworn, deposes and says as follows:

1.    I am an attorney associated with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing First Amended Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.    The sources of my information and the grounds for my belief are communications from our client and documents provided by our client regarding the claim, as well as the Points of Claim submitted in London arbitration and the proceedings had heretofore in this case.

3.    The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

4.    I declare under penalty of perjury of the laws of the United States that the statements in this verification are true and correct.

_____
PETER J. GUTOWSKI

## CERTIFICATE OF SERVICE

I, PETER J. GUTOWSKI, certify that I am counsel of record for Plaintiff.  On February 27, 2008, the within First Amended Verified Complaint was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys of record.

Additionally, I served by email a true and correct copy of same upon the following counsel:

> Patrick Crilley, Esq.
> Law Office of Richard A. Zimmerman
> Attorney for Global Coal
> 233 Broadway – Suite 2202
> New York, NY 10279

Peter J. Gutowski

Dated:  February 27, 2008

# EXHIBIT A

# TO

# FIRST AMENDED VERIFIED COMPLAINT

537-07/PJG/ROSS/PLS
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
PHOENIX BULK CARRIERS LTD.
80 Pine Street
New York, NY 10005
Telephone: (212) 425-1900
Facsimile: (212) 425-1901
Peter J. Gutowski (PG 2200)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
PHOENIX BULK CARRIERS LTD.,

               Plaintiff,

     -against-

UNICARBON LIMITED and
DYNACOAL LIMITED,

               Defendants.
-----------------------------------------------------------x

07 Civ. 10404 (RMB)

**DECLARATION OF
EDWARD COLL IN OPPOSITION
TO MOTION TO VACATE**

EDWARD COLL, states as follows:

1.     I am the President of Phoenix Bulk US, a shipping company based in Rhode Island which acts as the agent for the Plaintiff, Phoenix Bulk Carriers Ltd., ("Phoenix") in this action.

2.     I have been asked by Freehill, Hogan & Mahar LLP to submit a Declaration in response to a motion to vacate Phoenix' attachment of a freight payment made in connection with the transportation of a certain cargo of coal carried from China to Turkey on the M/V BRIGHT ZHEGIANG.

3.     In this respect, and as outlined more fully below, on behalf of the Plaintiff, we commissioned and arranged for an investigation to be undertaken with respect to the Defendants

NYDOCS1/298218.1

in this case, the relationship they have with two coal-importing companies in Turkey, and the latter's use of so-called "offshore" entities based in the British Virgin Islands through which they conduct business.

4.    The results of this investigation and various documents which bear out these points are set forth below in this Declaration.

5.    This information was provided as a consequence of contact with various charter brokers located both in the United States and the UK, the international investigative services of Gray Page based in the UK and various other charter and shipping sources, contacts we have with owning entities whose vessels have been chartered by these defendants and other sources.

6.    As discussed below, the evidence reveals that the transfer of freight which was attached (and which Mr. Mizracki seeks to release) in fact, represents the payment of a debt for the benefit of the defendant Dynacoal who is the receiver and consignee under the bill of lading.

7.    Mr. Mizracki carefully avoids any mention of this in his Declaration, no doubt hoping that the Plaintiff would not be able to locate and place before the Court the relevant bill of lading, which is annexed hereto as Exhibit G and which is discussed in greater detail below.

## General Corporate Structure of Defendants, their Parents and Global Coal.

8.    The two Defendants, Dynacoal and Unicarbon, are shell corporations formed in the British Virgin Islands, who were essentially used as chartering entities for the purpose of importing shipments of coal into Turkey by two large coal importers (described below) both of which are owned/controlled by Mr. Ayhan Mizracki ("Mr. Mizracki").[1]

9.    Unicarbon was originally registered in the British Virgin Islands on November 7, 2002 under Registration No. 520059, and although its corporate registration papers there identify

---

[1] Not surprisingly, Mr. Mizracki is the "director" who signed the declaration for Global Coal, the one making the motion.

an office in Road Town, Tortola, investigations at Tortola reveal that there is no actual office there whatsoever for Unicarbon, no employees, no presence, etc.

10.    In similar fashion, the other Defendant Dynacoal was also formed in the British Virgin Islands on September 23, 2005 under Registration No. 677723.

11.    Its registration documents in, the BVI corporate registry again purport to reflect an office at Road Town, Tortola, but investigation reveals that it has no actual office there whatsoever either.

12.    This is typical in the context of off-shore shell companies.

13.    At the risk of jumping ahead, the party that has now appeared in this action claiming to have its funds innocently captured, "Global Coal Trade Co. Ltd." (Global Coal") is similarly a BVI creation which was originally formed on April 30, 2004 under Company No. 594596.

14.    Once again, the records at the BVI registry reflect an office in Road Town, Tortola, but again, no actual business presence by Global Coal is maintained there, or anywhere, as far as we can tell, apart form that done by Mr. Mizracki from his offices in Turkey.

15.    The records in the BVI registry also show that this "company" (Global Coal), and I use that term loosely, was permitted to lapse and then, curiously, resurrected just last year when Mr. Mizracki, or persons acting at his behest, arranged for it to be "re-registered".

16.    Moving forward, and as briefly noted above, our investigation has confirmed that the two defendant shell entities (Unicarbon and Dynacoal) are utilized by Mr. Mizracki as the entities in whose name he buys and imports the coal for his two Turkish coal importing companies.

17.    Mr. Mizracki owns/controls several large coal importing companies based in Turkey.

18.    The lead company is called Enerji Maden Urunleri Sanayi ve Ticaret A.S. ("Enerji Maden"), and under this entity, he operates separate entities with similar names including Super Karbon Enerji Madencilik San. Ve Tic. Ve. (which I will refer to as "Super Karbon"), and Super Enerji Madencilik ("Super Enerji Maden").

19.    In order to meet their coal importing needs both for production and sale in Turkey, Mr. Mizracki enters into long term supply agreements with suppliers in China, primarily, a large supplier based in Qinhuangdao, which is called China National Coal Industry Qinhuangdao Import and Export Co. (For ease of reference, I will refer to them as "CNCIQ".)

20.    Of course, he does not do so in the names of the *brick and mortar* Turkish entities with an established presence in Turkey (i.e. the Enerji Maden companies noted above), but does so in his BVI shell entities including the two defendants Unicarbon and Dynacoal.

21.    Returning to these supply contracts, CNCIQ is a well-known exporter of coal in China and inquiries with them, and through brokers, have confirmed that Unicarbon and subsequently Dynacoal each have been the names utilized in long-term supply contracts for the sale and shipment of large quantities of coal, in bulk, to Mr. Mizracki (and his "Enerji Maden" Turkish entities).

22.    Most recently, it was confirmed through brokers that Dynacoal has an ongoing agreement (understood to be annual) with CNCIQ for the sale and export of shipments at a rate of about 1 - 2 cargoes per month in "Panamax" size vessels. See **Exhibit A.** This information was provided by Dynacoal's (Mr. Mizracki's) Turkish brokers, identified in greater detail below.

23.    A Panamax vessel refers to a standard bulk carrier which can transport approximately 75,000 M/T of a bulk cargo, like coal.

24.    The shipments of coal purchased and carried under the Dynacoal and Unicarbon name are transported and discharged in Turkey for use and disposition by Enerji Maden, including Super Enerji Maden and/or Super Karbon.

25.    All of these entities are operated from the same business locations, principally from the same office in Istanbul, Turkey located at:

> Buyukdere Cad
> Akabe Is Merkaezi No: 78-80 Kat.40
> Mecidiyekoi – Istanbul, Turkey

26.    It is here that one will find Mr. Mizracki, certainly not at the illusory office in the BVIs.

27.    These same entities also utilize the same broker, Aksoy Denizcilik Tasimacilik, which also operates from an office in Istanbul and is primarily involved in the booking of vessels for the transportation of the coal from China into Turkey for the group.

28.    As noted above, the group is controlled by Mr. Mizracki.

29.    With respect to Enerji Maden, he is the controlling shareholder, holding 89.5% of the shares.

30.    He is the chairman of the board of directors, along with Ece Mizracki, who serves as vice-chairman.

31.    Mr. Mizracki also holds an equal controlling share interest in Super Karbon.

32.    He is identified as the vice-chairman of that Turkish corporation.

33.     Mr. Mizracki, as we now know from the Declaration just filed in this action, is "the director" (presumably the only director), of Global Coal, which, by all accounts, appears to be the latest BVI incarnation, which is being used to supplant Dynacoal. (More on this below.)

**How this Whole Operation Works, and Why the Funds Under Restraint are Funds in which the Defendants have an Interest.**

34.     As outlined above, Dynacoal and Unicarbon are the "chartering arms" under which Enerji Maden, Super Karbon, Super Enerji, etc, purchase and transport their coal from China into Turkey.

35.     Long term supply contracts are entered into with a supplier like CNCIQ and then Mr. Mizracki utilizes one of his BVI offshore shell entities to serve as the nominal buyers of the coal and the charterers of the vessels to bring the coal to Turkey.[2]

36.     By way of illustration, and to outline for the Court how these charter trades are performed, when a shipment of coal is about to be made, and as noted above, Mr. Mizracki generally runs about two shipments a month into Turkey, his broker Askoy Denizcilik, puts out into the charter market an email (which is sometimes referred to as "an indication") identifying the general nature of the shipment on which they would like the owners of vessels to quote or bid.

37.     For illustration purposes, attached to this Declaration as **Exhibit B** is one of these indications which was put out by this group's broker in September 2007 identifying one of the monthly shipments it had coming out of CNCIQ in China under the supply contract which Mr. Mizracki put in the name of Dynacoal.

---

[2] By all accounts, and as detailed briefly above, in the wake of the attachment, Mr. Mizracki has now revitalized another of his BVI shell entities, Global Coal, in order to avoid the attachment but I do not want to get ahead of myself.

38. As is evident, the indication generally describes the amount of the cargo, the dates for the shipment and the identity of the charterer Dynacoal.

39. In this situation, we see Dynacoal as the charterer, an indication of the approximate amount of cargo (50-70,000 M/T of coal), this time coming from CNCIQ's facility at Haunghua and going to "1-2 Turkey" (i.e. one or two discharge ports in Turkey).

40. That same indication also reflects the fact that the group was still looking for another vessel for a lifting from CNCIQ'S facility at Qinhuangdao, and again Dynacoal was going to be the charterer. See language at bottom of Exhibit B.

41. A similar charter inquiry is found at **Exhibit C**.

42. Here, the charterer (or "ACCT", meaning the name of the entity they would use as charterer) for which the quote was being solicited, was again "Dynacoal" of BVI, and this indication then goes on to reflect one port in "N China (North China) and 1-2 discharge ports "Turkey" with the cargo to be ready on or about "25 August onward".

43. This type of an indication (Exhibit B and C) are the initial starting points in what will then turn out to be an eventual charter party or "fixture", the specifics of which will be negotiated between the brokers. See also **Exhibit D**, another indication for a Dynacoal cargo from China.

44. For the past several years, Mr. Mizracki has named Dynacoal as charterer is because that is the same corporate shell he has been inserting into the supply contract with CNCIQ. See Exhibit A and his broker's confirmation that Dynacoal has the supply contract with CNICQ and are their "usual" shippers.

45. The shipments of coal from CNCIQ under the "Dynacoal" long term supply contract include terms which provide for FOB delivery.

46.    In other words, CNCIQ only need to place the coal on the dock for loading in China, but it is Dynacoal, as the buyer, that needs to go out and charter the ship in order to arrange for the transportation.

47.    As such, Dynacoal is also identified as the receiver and consignee under the bill of lading, it also has the obligation to pay the freight to the owner of the vessel that is being chartered.

48.    When an indication is sent out in the market looking for a vessel, owners sometimes ask for some background information about the charterer.  In connection with an indication sent out this year for a vessel, the group's broker Aksoy sent out the information referred to above and identified in Exhibit A.

49.    Here, Aksoy confirmed the background and relationship the two defendant chartering entities (Dynacoal and Unicarbon) play in the importation of the coal for the "Group" of Turkish coal importers.

50.    As appears in the message, Aksoy confirmed Dynacoal's supply agreement with CNCIQ, their regular trade from China, the volume of business they have been doing of late, their relationship with Unicarbon in the same "group" (i.e. the Enerji Maden) and the numerous other vessels that they had fixed (chartered) in '07 and '06 in this manner.

51.    Moving forward with my discussion of the way this business is done, when an owner responds to an indication like the ones identified above, the brokers then negotiate the terms of the charter and eventually those terms are memorialize in what is called a "fixture recap".

52.    Following that, the vessel will then steam to loadport, tender its notice of readiness, load the cargo and a bill of lading will be issued for that cargo.

53.    By way of further illustration, in late July 2007, Dynacoal went out with another indication for a shipment that it had scheduled to lift from CNCIQ in early August.

54.    That indication eventually resulted in their charter of the vessel SWIFT FLAME under a charter party dated July 27, 2007 with the vessel's operator Industrial Carriers, and that vessel proceeded to CNCIQ's facility at Qinhuangdao to load the cargo.

55.    Under that contract, 66,232 M/T of coal was loaded on the SWIFT FLAME and then a bill of lading was issued, a copy of which is attached as **Exhibit E**.

56.    As is evident from Exhibit E, and pursuant to Dynacoal's position as buyer under the long-term supply agreement between Dynacoal and CNCIQ, Dynacoal was listed as the consignee (the nominal receiver of the cargo), the charter party dated August 27, 2007 is identified in the box in the lower left hand side of the bill of lading and the loadport in China and the discharge port in Turkey are identified.

57.    In addition, the Court will note that Super Enerji is identified as the "notify address" because Dynacoal, the BVI shell corporation, does not have any real office in Turkey (nor in the BVI's as indicated above) and since Dynacoal is really the chartering arm for this Enerji Maden and Super Enerji group, the real parties behind the scene who are importing the coal are set forth as the "Notify Address", along with Mr. Mizracki's office address in Istanbul, so that the ship owner knows where there is an actual address to provide proper notice when the vessel arrives.

58.    Another example of this system of purchase and shipment is found in a similar bill of lading issued for another shipment on a vessel chartered by Dynacoal for carriage of coal purchased by it under its supply contract with CNCIQ is reflected in **Exhibit F**.

59.    In Exhibit F, we again see the supplier CNCIQ identified as the shipper at the top, as they are the entity supplying the coal loaded under the long-term supply agreement between CNCIQ and Dynacoal.

60.    In this shipment, Dynacoal had chartered the PIONEER SKY, and the freight due for the shipment from Dynacoal for the ocean carriage of the coal to it as receiver and consignee was to be paid under that October 10, 2007 charter to the owners of the PIONEER SKY.

61.    Once again, and even though Dynacoal was identified as the nominal consignee, Super Enerji Maden (Mr. Mizracki's Turkish coal distributor) appears as the notify party because Dynacoal has no real presence in Turkey for the reasons discussed above.

**The Subject Transaction**

62.    In conformity with the shipping and chartering practice outlined above, in December 2007, the Group's broker Aksoy went out with another indication looking for a vessel for a shipment under the supply contract with CNCIQ to be lifted (loaded) in late December 2007.

63.    Through brokers, we were able to secure a copy of that indication, which is **Exhibit G.**

64.    As is plain from that exhibit, this reflected a request, through Turkish brokers, for a charter by Dynacoal (identified in the indication as "A/C [account of] Dynacoal Ltd.") for a lifting of coal at one of the CNCIQ facilities in China with discharge ports in Turkey.

65.    This indication was initially released to the market on December 6-7.

66.    When no firm fixture (charter of a ship) was obtained, it was placed out again in the market on December 12.

67.    We have obtained a copy of this reiteration of the indication and I quote it verbatim as follows:

> Qte
>
> A/C DYNACOAL
> 1 HUANGHUA/1-2 TURKEY (INT.MARMARA)
> 50/65,000 MT COAL ABT 47'
> LAYCAN 20/30 DEC
> 15000C/10000C
> 2.5 PCT ADC 5PCT TTL
> SUBS FORMALITIY

68.    In the wake of the December 12 reiteration of Dynacoal's need for this vessel, negotiations were then initiated by the brokers for the owners of the BRIGHT ZHEJIANG, the vessel which generated the freight which has been attached in this action.

69.    The BRIGHT ZHEJIANG is a bulk carrier of a size which was suited for the lifting of the cargo identified in Dynacoal's indication above.

70.    For the Court's guidance, I also call attention to the fact that within the indication quoted above in paragraph 67, there is a reference to

> Laycan 20/30 Dec

71.    This is a maritime term which refers to laydays canceling, or the "window" within which this cargo will be ready and correspondingly the window within which the vessel needs to present and load.

72.    A charter party was eventually booked for this shipment and the BRIGHT ZHEJIANG made her way to the loadport to lift the cargo from CNCIQ.

73.    The vessel arrived and loading was completed on or about December 22, 2007 within the "laycan" date indicated in Dynacoal's initial indication.

74.    She lifted a total of 63,015 M/T of coal for discharge in Turkey.

75.    In the presentation submitted by Mr. Mizracki, (see Mizracki Declaration in Support of Motion to Vacate) he identifies Global Coal as being the charterer that he inserted for that lifting.

76.    This obviously conflicts with the original indications which identified his usual chartering entity Dynacoal as the charterer, and thus begs the question of what happened to trigger that switch because obviously, the supply contract remains in Dynacoal's name or Dynacoal would not have been identified in the original charter indications sent out on December 6 and 12, see Exhibit G and paragraph 67 above.

77.    I would respectfully submit to the Court that the answer is simple and can be traced to the fact that this Court had previously issued an order of attachment in late November and as a consequence of the restraint of a modest sum in early December (which then resulted in our counsel being obliged to place Mr. Mizracki on notice of the restraint in New York) he then hastily substituted the identity of the charter by utilizing his recently reactivated one of this other BVI shell entities (Global Coal) as the nominal charterer to avoid the payment of freight due under that shipment being captured in New York.

78.    However, as the supply contract is with Dynacoal, it was more difficult for him to recast the bill of lading issued in connection with the shipment, a copy of which we have managed to secure and which illustrates and identifies of the true parties to the transaction and a copy of that is attached as **Exhibit H**.

79.    Here, the true story is revealed because it again identifies Dynacoal as the receiver and consignee of the coal, just like all the other situations, Super Enerji Maden as the notify party and does not reference Global Coal at all.

80. It similarly identifies CNCIQ as the shipper under the long term sales contract and, as before, since the shipment is FOB, the freight which is due from Dynacoal as the receiver, was to be paid to the owner of the BRIGHT ZHEJIANG as per the terms of the charter party which was initially identified as being a fixture (charter) for Dynacoal in the recap set forth above.

81. As the receiver and consignee under the bill of lading, Dynacoal had the obligation to pay the freight to the owner of the BRIGHT ZHEJIANG in exchange for the ocean carriage performed by that vessel in transporting the cargo to Turkey and of course Mr. Mizracki's business office address is provided on the bill of lading because his BVI shell entities have no address.

82. When Mr. Mizracki became aware of the fact that an attachment was pending in New York (by virtue of the fact that Plaintiff had frozen a small sum in early December), he obviously knew that if another payment was made by Dynacoal to the owner of the BRIGHT ZHEJIANG it would be frozen.

83. Nevertheless, he needed to make that payment in order to satisfy the freight obligation to the owner of the BRIGHT ZHEJIANG so he hastily substituted on of this other BVI shell companies (Global Coal) which was only recently reactivated in 2007, and then reshuffled the identity of the charterer so as to mask the fact that the payment was being made for the benefit of and to extinguish Dynacoal's freight debt.

84. But what he could not avoid, and what he presumably thought we would never find, was the bill of lading which identified the true parties to the deal.

85.    Similarly, what Mr. Mizracki could not undo was the underlying obligation for the payment of the freight, which was a debt owed by Dynacoal, the consignee and the buyer of the coal from CNCIQ, to the ship owner.

86.    For the Court's guidance, it was this information which we provided to the Court and which formed the basis of the application we made in late December under which we confirmed that a shipment which was being booked for the benefit of Dynacoal as buyer, the original charterer and consignee, was going to be lifted on the BRIGHT ZHEJIANG and why the freight payment would be made for the benefit of Dynacoal which was going to be masked so as to avoid payment. In this respect, brokers had indeed confirmed that the BRIGHT ZHEJIANG had in fact, picked up the Dynacoal cargo. See **Exhibit I.**

87.    It was upon this basis that the Court issued the amended Order, identifying this freight payment involving the BRIGHT ZHEJIANG as representing the payment in which Dynacoal had an interest and would therefore be subject to seizure.

88.    As we correctly anticipated, Mr. Mizracki did indeed switch the identity of the charterer from that which originally appeared in the indication in early December to his alternative BVI entity Global Coal but that transfer was captured because the identity of the vessel had been learned and was identified in the revised attachment.

89.    To the extent the payment of the freight represents satisfaction of a debt owed by Dynacoal under the bill of lading (Exhibit G), the payment properly represents funds in which Dynacoal has an interest.

90.    Not unsurprisingly, Mr. Mizracki makes no mention of any of these facts in his plain "vanilla" presentation of a poor, disinterested charterer whose innocent freight payment was wrongfully captured.

91.    He is the controlling individual of all these companies, the vessel was chartered for the benefit of his BVI shell Dynacoal, he manipulated the identity of the charterer to circumvent the order issued in this case, and his submission is purposefully misleading.

92.    He purposely failed to identify the bill of lading in his submission to the Court, failed to identify the receiver as Dynacoal, failed to identify his company Super Enerji Maden as the notify party, and the fact that the freight was being paid to satisfy Dynacoal's obligation to the owners under the bill of lading.

93.    Instead, he stands before the Court as a simple charterer with no supposed relationship to the claim or the parties at interest in the claim, but rather a director of a BVI company, who happens to be signing his declaration in Istanbul.  See last page of Mizracki Declaration.

94.    Of equal import is the fact that Mr. Mizracki failed to put any of the charter negotiation e-mail exchanges leading up to the fixture because they would have disclosed that Dynacoal was the nominated and contemplated charterer.

95.    I appreciate that the purpose of a declaration is not to argue the case and I will leave that to our counsel to do so but I would respectfully submit having been in this business for more than 25 years, Mr. Mizracki's submission to the Court is a subterfuge, does not provide the Court with the full story, fails to disclose his interest in all these companies and is designed to mislead the Court into the false impression that his BVI shell Global Coal should have its funds released.

96.    This is a transaction involving a purchase by Dynacoal, the Defendant. The obligation to pay the freight in this FOB shipment is Dynacoal's, under both the purchase agreement and the bill of lading, and the substitution of Global Coal, another BVI shell, at the

eleventh hour is a subterfuge designed to circumvent the order of attachment which should not be permitted because the payment is still satisfying Dynacoal's freight debt under the bill of lading and therefore, represents money in which it has an interest.

97.    I thank the Court for its attention and review of my comments.


_____
Edward Coll

JAN-31-2008(THU) 04:15

eleventh hour is a subterfuge designed to circumvent the order of attachment which should not be permitted because the payment is still satisfying Dynacoal's freight debt under the bill of lading and therefore, represents money in which it has an interest.

97.    I thank the Court for its attention and review of my comments.

I declare under penalty of perjury under the laws of the United States of America the foregoing is true and correct.

_____
Edward Coll

# EXHIBIT A

Ed Coll

| | |
|---|---|
| From: | Claudio Ceccarelli [panamax@ifchor.ch] |
| Sent: | Tuesday, August 14, 2007 6:42 AM |
| To: | Chartering |
| Subject: | Doc-No. 4167864 |

Doc-No. 4167864  14/AUG/2007  12:38 h  CC

ED/CC

YSTWITH

GOT FOLL

Thks yrs and sorry for late reply.chrts counter as fllws for reply w/i 30 mins:-

Pls adv
Ows/managers full stye

Bss a/e
- sf abt 47'
- l/p : as per chrts last
- pls adv laycan
- frt usd 41.50 pmt bss marmara or nemrut
      usd 40.50 pmt bss iskenderun
- ryrting on combo ? (pls explain)
- 95 pct payable w/i 5 bdays after s/r bs/l , remain as per chrts last
- nor cls: chrts last (sorry cannot be changed due to being coa terms)
- chabe : imperative (that is regular biz more than 5 years and evertime
  chrts agent to use for smooth operation w/o any problem/complaint fm ows) e n d


DYNACOAL LIMITED, BVI


Messrs Dynacoal Limitedhave an agreement with China National Coal Industry Qinhuangdao
Import/Export Co Ltd.

They are usual shippers in our china biz/coa.

15 (or so) vsls hs been fixed by same Group during 2003 (as unicarbon in same group).

Their annual capacity abt 1.7/2 millon tonnes fm china only.

They hv regular b.sea biz in coaster size as well.


last few fixtures

-mv bonnie smithcwick-cp dd 20/06/07
-mv rip hudner-TTMI- cp 06/06/07
-Mv arabella-seabream-cp dd 21/05/07
-Mv oceanic breeze - mayflower-cp dd 15/03/07
-navios gemini s-cosco- cp dd 28/12/06
- mv stefania--glencore-cp dd 04.08.2006
- tai prize-glencore - cp dd 04/08/06
- mv taskent-deniz nakliyat-cp dd 08.06.2006
- mv cemtex venture-glencore-cp dd 31/07/06
-mv selecta -viktoria marin- cp dd 02.02.06
-mv golden glow-Golden glow steamship-cp dd 05/02/06
- mv sinotreasure - Sinotreasure Shipping Limited/ cp dd 05/01/06 -mv red rose - seven
  mountain shipping/ cp dd 24/10/05 -mv kavo delfini-/seven mountain shipping / cp dd
21/10/05 -mv dimitris perrotis / seven mountain shipping / cp dd 14/09/05 -mv ocean pearl
  / seven mountain shipping / cp dd 02/05/05


rgds

-----Original Message-----

# EXHIBIT B

-----Original Message-----
From: Figen TULAY [mailto:figen@aksoyshipping.com]
Sent: Friday, September 28, 2007 10:38 AM
To: Figen TULAY
Subject:

Fm aksoy shpg/istanbul
Tel +90 216 445 50 95
Fax +90 216 445 50 94
Email figen@aksoyshipping.com
msn figensandal@hotmail.com
web www.aksoyshipping.com <http://www.aksoyshipping.com/>

our usual chrts fresh open,

dynacoal ltd
50/70.000 mt coal abt
huanghua/1-2 turkey
20/30 oct
15000c/10000c
1.25 pct ttl

huanghua 229 m loa

still hv,

dynacoal ltd


jing tang gang a/o qinhuangdao/1-2 turkey 50/70.000 mt coal abt 47 ppt 15000c/10000c
1.25 pct ttl


rgds/figen

+++

# EXHIBIT C

Ed Coll

**From:**    Claudio Ceccarelli [panamax@ifchor.ch]
**Sent:**    Thursday, August 09, 2007 6:41 AM
**To:**    Chartering
**Subject:**    Doc-No. 4156307

Doc-No. 4156307    9/AUG/2007    12:41 h    CC

YSTWITH

HAD ANOTHER GO

CAN TRY AS FOLLOWS

ACCT DYNACOAL OF BVI
1 n.china (INTN JINGTANG OR XINGANG)/1-2 turkey (out of iskenderun ,nemrut,marmara - max 2
ports) NO DRAFT RESTRICTIONS upto fcc coal abt 47
25 AUG ONWARD
15000c/10000c
IDEAS:
USD 40 BSS DILISKILESI(MARMARA)
USD 39 BSS ISLENDERUN
IF 2 DISPORT USD 1 ON THE TOP OF HIGHEST RATE vsls dts
2.5 pct PST US

*************************************************************
IFCHOR GROUP SA, Place Pépinet 1, 1003 Lausanne, Switzerland as brokers only

capes@ifchor.ch - panamax@ifchor.ch - handy@ifchor.ch securities@ifchor.ch -
operations@ifchor.ch - capesops@ifchor.ch
www.ifchor.com

Phone: +41 21 310.31.31 - Fax: +41 21 310.31.00/01
Tlx: 450 351 IFC CH - 450 352 IFOPS CH
*************************************************************

1

# EXHIBIT D

-----Original Message-----

YSTWITH

COAL TO TURKEY

PLS ASK OWNS TO OFFER BASIS FOLL TERMS:

-A/C : DYNACOAL LTD, B.V.I

-OWS : PLS ADV

-OWS HV TO PROVICE "NOC (NO OBJECTION CERTIFICATE) " FM HEADOWS FOR FRT/DEMM PAYMENT

 IF VSL UNDER T/C OR MANAGEMENT

-,...MT 5 PCT MOLOO COAL IN BULK STOWING ABOUT 47'.

-LOADPT : 1 N.CHINA (OUT OF JING TANG GANG ,XINGANG, HUANGHUA,QINHUANGDAO)

2

# EXHIBIT E

CODE NAME: CONGENBILL .EDITION 1994
shipper

**BILL OF LADING**

TO BE USED WITH CHARTER – PARTIES

B/L No. 1

Reference No.

CHINA NATIONAL COAL INDUSTRY QINHUANGDAO
IMP. AND EXP. CO., LTD.252 MINZU ROAD QINHUANGDAO CHINA

Consignee

DYNACOAL LIMITED

CARRIER:
INDUSTRIAL CARRIERS INC

Notify address

SUPER ENERJI MAD.INS.SAN.VE TIC.A.S.
BUYUKDERE CAD.AKABE IS MRK.NO:76-80 KAT 4
MECIDIYEKOY-ISTANBUL/TURKEY

| Vessel | Port of loading |
| SWIET-FAME | QINHUANGDAO,CHINA |

Port of discharge
DILISKELESI OR DERINCE,TURKEY

Shipper's description of goods

Gross weight

COPY

N/M IN BULK      DATONG SIZED STEAM COAL
                 TOTAL NET WEIGHT:66232MT
                 SAY SIXTY SIX THOUSAND TWO HUNDRED AND THIRTY TWO
                 METRIC TONS ONLY

CLEAN ON BOARD
C/P NO:070727-01

**NON-NEGOTIABLE**

(of which               on deck at Shipper's risk; the Carrier not
being responsible for loss or damage howsoever arising)

Freight payable as per
CHARTER – PARTY dated 27.07.2007
TO INDUSTRIAL CARRIERS INC

FREIGHT ADVANCE.

Received on account of freight:

Time used for loading....................days ....................hours.

SHIPPED at the Port of Loading in apparent good order and
condition on board the Vessel for carriage to the Port of
Discharge or so near thereto as she may safely get the goods specified
above.
Weight , measure , quality , quantity , condition , contents and value
unknown.
IN WITNESS whereof the Master or Agent of the said Vessel has signed
the number of Bills of Lading indicated below all of this tenor and date,
any one of which being accomplished the others shall be void.

FOR CONDITIONS OF CARRIAGE SEE OVERLEAF

| Freight payable at | Place and date of issue |
| | QINHUANGDAO AUG 7.,2007 |
| Number of original Bs/L | 中国秦皇岛外轮代理有限公司 |
| THREE(3) | SIGNED AS AGENT FOR AND BY |
| | BEHALF OF THE MASTER |
| | VASYLYEV OLEKSANDER |
| | AS AGENTS |

Printed and sold by
Witherby & Company Limited,32/36 Aylesbury Street,
London EC1R 0QT.
Tel. No.0171 251 5341 Fax No.0171 251 1296
by authority of The Baltic and International Maritime Council,
(BIMCO) Copenhagen.

# EXHIBIT F

P:1

CODE NAME "CONGENBILL". EDITION 1994

shipper

**CHINA NATIONAL COAL INDUSTRY QINHUANGDAO IMP. AND EXP. CO., LTD. 252 MINZU ROAD QINHUANGDAO CHINA**

**BILL OF LADING**

Page 2

B/L No.

1

TO BE USED WITH CHARTER - PARTIES

Reference No.

Consignee

**DYNACOAL LIMITED**

Notify address

**SUPER ENERJI MAD.INS.SAN.VE TIC.A.S. BUYUKDERE CAD.AKABE IS MRK.NO:78-80 KAT 4 MECIDIYEKOY-ISTANBUL/TURKEY**

| Vessel | Port of loading |
|---|---|
| **PIONEER SKY** | **QINHUANGDAO,CHINA** |

Port of discharge

**ISKENDERUN AND/OR NEMRUT BAY,TURKEY**

*ORIGINAL*

Shipper's description of goods                                             Gross weight

**N/M IN BULK**          **DATONG SIZED STEAM COAL TOTAL NET WEIGHT:30635MT SAY THIRTY THOUSAND SIX HUNDRED AND THIRTY FIVE METRIC TONS ONLY**

**SHIPPER'S WEIGHT FREIGHT PAYABLE AS PER CHARTER PARTY**

(of which          on deck at Shipper's risk;the Carrier not being responsible for loss or damage howsoever arising)

| Freight payable as per CHARTER - PARTY dated          10.10.2007 | SHIPPED at the Port of Loading in apparent good order and condition on board the Vessel for carriage to the Port of Discharge or so near thereto as she may safely get the goods specified above. Weight , measure , quality , quantity , condition , contents  and  value unknown. IN WITNESS whereof the Master or Agent of the said Vessel has signed the number of Bills of Lading indicated below all of this tenor and date, any one of which being accomplished the others  shall be void. |
|---|---|
| FREIGHT ADVANCE. Received on account of freight: | |
| Time used for loading , ................ days ............. hours. | FOR CONDITIONS OF CARRIAGE SEE OVERLEAF |

| Freight payable at | Place and date of issue **QINHUANGDAO**   **OCT 24.,2007** |
|---|---|
| Number of original Bs/L **THREE(3)** | Signature SIGNED AS AGENT FOR AND ON BEHALF OF THE MASTER **KOVALEVSKYY SERGIY** |

C.15  Printed and sold by Witherby & Company Limited ,32/36 Aylesbury Street, London EC1R 0ET.

# EXHIBIT G

Date: Thu, 6 Dec 2007 13:53:33 +0200

FM KOZA CHART ISTANBUL

RE DYNACOAL

chrts full terms as follows :

++

-A/C : DYNACOAL LTD/BVI-UK.

-OWNS : PLS ADVISE
  OWS HAVE TO PROVIDE NOC (NO OBJECTION CERTIFICATE FOR FRT/DEMM PAYMENT)
  FROM HEADOWS IF VSL UNDER T/C OR MANAGEMENT
- --------- MT 5 PCT MOLOO COAL IN BULK STOWING ABOUT 47 -LOADPT : 1 SB XINGANG OR
JINTANGGANG OR QINHUANGDAI IN CHOPT -OWS TO CHECK AND SATISFY THEMSELVES
REGARDING PORT RESTRICTIONS AT L/P -DISPT : 1 SBP SEA OF MARMARA AND/OR 1 SB
NEMRUT AND/OR ISKENDERUN -LAYCAN : 18/23 DEC 2007 (PLS ADV VSLS ITINERARY) -LOAD
RATE :15.000 MT PWWD OF 24 CONSEC HRS SHINC -DISC RATE :15.000 MT PWWD OF 24 CONSEC
HRS SHINC BSS ISKENDERUN
      10.000 MT PWWD OF 24 CONSEC HRS SHINC BSS MARMARA OR NEMRUT -LAYTIME FOR
LOADING SHALL COMMENCE 24 HRS AFTER NOR TENDERED UNLESS LOADING HAS
COMMENCED EARLIER IN WHICH CASE ACTUAL TIME USED TO COUNT.

-18 HRS T/TIME AT D/PORT (OR TO BE SHARED 50/50 % IF 2 D/PS TO BE
USED) UNLESS SOONER COMMENCED
-FRT : USD ----- PMT FIO GRAB TRIMMING ONLY BSS 1/1 ISKENDERUN DISCH
    USD ----PMT FIO GRAB TRIMMING ONLY BSS 1/1 MARMARA OR NEMRUT
    EXTRA USD 0.50 PMT FIO ON ENTIRE QTTY FOR 2ND D/P
-95 PCT PAYABLE W/I 5 BDAYS ACOL AND S/R BS/L WHICH TO BE PAID "FRT PAYABLE AS PER
C/P DD.. TO OWS" AND "CLEAN ON BOARD"
-FREIGHT DEEMED EARNED ON CARGO BEING LOADED DISCPOUNTLESS AND NON-
RETURNABLE VESSEL AND/OR CARGO LOST OR NOT LOST.
-NOR TO BE TENDERED W/W/W/W FM 8 AM TO 5 PM FM MONDAY TO FRIDAY AND FM
8 AM TO 12 NOON ON SATURDAY AT L/P,
  W/I 8/17 HRS SHINC AT D/P(S)
-DEMURRAGE USD ------ PDPR/HDWTS BE
-BALANCE FRT TO BE SETTLED TOGETHER WITH DEM/DES W/I 30 DAYS AFTER COMPLETION OF
DISCH -ANY TAX/DUES/WHARFAGES ON CARGO TO BE FOR CHARTERER'S ACCOUNT.
ANY TAX/DUES/WHARFAGES ON VESSEL/FREIGHT TO BE FOR OWNER'S ACCOUNT -
CHARTERER'S AGENT BE - OFFICAL TARIFF TO APPLY FOR PORT DISB -2.50 PCT TTL HERE ON
F/D/D -OWISE CHRTS PROF GENCON C/P -SUB STEM,SHIPERS AND RECEIVERS APPRVL TO BE
LIFTED WI 24 HRS AFTER AGREED ON MAINTERMS END
  ++
  BRGDS

# EXHIBIT H

DEC-12-2007 17:05   FROM:                                                    P:1

CODE NAME:"CONGENBILL".EDITION 1994

shipper

CHINA NATIONAL COAL INDUSTRY QINHUANGDAO
IMP. AND EXP. CO., LTD.252 MINZU ROAD QINHUANGDAO CHINA

**BILL OF LADING**

TO BE USED WITH CHARTER – PARTIES                B/L No.

Reference No                                            1

Consignee

DYNACOAL LIMITED

Notify address

SUPER ENERJI MAD.INS.SAN.VE TIC.A.S.
BUYUKDERE CAD.AKABE IS MRK.NO:78-80 KAT 4
MECIDIYEKOY-ISTANBUL/TURKEY

| Vessel | Port of loading |
| BRIGHT ZHEJIANG | QINHUANGDAO,CHINA |

Port of discharge
MAIN PORT(S) OF TURKEY

Shipper's description of goods                    Gross weight

COPY

N/M IN BULK        DATONG SIZED STEAM COAL
                   TOTAL NET WEIGHT:63015MTMT
                   SAY SIXTY THREE THOUSAND AND FIFTEEN METRIC TONS ONLY

                   CLEAN ON BOARD
                   FREIGHT PAYABLE AS PER CHARTER PARTY

**NON-NEGOTIABLE**

(of which                     on deck at Shipper's risk; the Carrier not
being responsible for loss or damage howsoever arising)

Freight payable as per
CHARTER – PARTY dated ...........................

FREIGHT ADVANCE.
Received on account of freight:

.............................................................

Time used for loading....................days ......................hours.

SHIPPED at the Port of Loading in apparent good order and condition on board the Vessel for carriage to the Port of Discharge or so near thereto as she may safely get the goods specified above.
Weight , measure , quality , quantity , condition , contents and value unknown.
IN WITNESS whereof the Master or Agent of the said Vessel has signed the number of Bills of Lading indicated below all of this tenor and date, any one of which being accomplished the others shall be void.

FOR CONDITIONS OF CARRIAGE SEE OVERLEAF

| Freight payable at | Place and date of issue |
| | QINHUANGDAO    DEC 22, 2007 |
| Number of original Bs/L | 秦皇岛外轮代理有限公司 |
| | CHINA OCEAN SHIPPING AGENCY QINHUANGDAO |
| THREE(3) | SIGNED AS AGENT FOR AND ON |
| | BEHALF OF THE MASTER |
| | KONG SHIBO |

C.15  Printed and sold by
Witherby & Company Limited, 32/36 Aylesbury Street,
London EC1R 0GT.

# EXHIBIT I

-----Original Message-----
From: Julian Morgan [mailto:hrs.pmx@howerobinson.com]
Sent: Thursday, December 13, 2007 9:40 AM
To: Chartering
Subject: DYNACOAL

HOWE ROBINSON SHIPBROKERS - Panamax Dept.

E-mail: hrs.pmx@howerobinson.com
JNM44896861   13/12/2007   14:39:33


Ed / Julian

BRIGHT ZHEJIANG    83 67,368  BC     BORYUNG     17-18DEC
COVERED THE DYNACOAL N.CHINA/TURKEY COAL STEM AT $52 PMT

I BELIEVE THEY STILL HV ANOTHER STEM THAT WUD SUIT YSTWYTH IF INTERESTED


BRDGS

# EXHIBIT B

# TO

# FIRST AMENDED VERIFIED COMPLAINT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------x

PHOENIX BULK CARRIERS LTD.,

                 Plaintiff,

       -against-
UNICARBON LIMITED and
DYNACOAL LIMITED,

                Defendants.
----------------------------------------------------x

07 Civ. 10404 (RMB)

*SUR-REPLY* DECLARATION
of EDWARD COLL

EDWARD COLL, states as follows:

       1.       I have previously submitted a declaration in this action. I have since reviewed the reply submissions filed by Global Coal, including the Mizrakci Declaration and the exhibits annexed thereto. I have the following comments in response, which illustrate that the purported "sales" transaction identified therein is illusory and designed to circumvent the attachment.

**The December 3, 2007 "Sales" Contract is illusory and makes no commercial sense.**

       2.       In Mr. Mizrakci's Reply Declaration, he states that Dynacoal had no *"property interest"* in the payment for the coal on the vessel because it had *"already concluded a contract of sale"* with Global Coal. He submits, as Ex. H, the purported sales contract, and several other exhibits to support his allegations. That contract, however, and the additional exhibits, make absolutely no commercial sense, are contradicted by his contemporaneous actions (which he cannot explain away), and in fact reveal that the payment was for an earlier shipment purchased by Dynacoal.

       3.       As discussed more fully below, the documents reveal that the supposed "sale" to Global Trade, which allegedly divested Dynacoal of any interest in the funds, is no more than an in-house paper maneuver designed to give the false impression that such a sale had taken place. In point of fact, no *real* sale to Global Coal took place, and the payment on December 13 (which Mr. Mizrakci claims was payment for the subject shipment) actually relates to an earlier *Dynacoal shipment,* not the cargo supposedly sold to Global Trade. Hence, his evidence of payment is misleading, and does not support that a bona fide sale to Global Coal had occurred, and thus Dynacoal did indeed retain an attachable interest in the payment seized. The following points bear this out:

       (i)       The date of the purported sales contact is contradicted by Dynacoal's efforts to charter a vessel in early December. The sale contract presented is purportedly dated December 3, 2007 (Ex H). I would submit that Mr. Mizrakci used that date in order to give the Court the false impression that the sale preceded the notification that he received of the attachment in

this case (which he received sometime after Dec 5), and thus his sale contract was just *business as usual.* But when he inserted the fake Dec. 3 date, he forgot to take into account the name he used when he entered the market to charter a ship for this cargo. On Dec 5, he went into the market, *as Dynacoal*, looking for a ship. (See, original Coll Declaration at ¶ 62-66 and Ex G, the Dec 6 inquiry *by Dynacoal* to charter a ship.) If Dynacoal had really "sold" its interest in this shipment to Global Coal on December 3, as Mr Mizrakci *now* claims, Global Coal would have been the charterer identified in the inquiry, not Dynacoal. His contemporaneous actions (i.e. seeking to charter a vessel in the name of Dynacoal after Dec 5) reveal that the date of this supposed sale contract is contrived.

(ii)   The same holds true with respect *Dynacoal's* follow-up inquiry in the market on December 12 (*see* Coll Declaration at ¶63-68 regarding Dynacoal's reiteration of its continued need for a ship in Dec.). Again, if Dynacoal had already sold the cargo to Global Coal on Dec 13, as Mr. Mizrakci now claims, why was Dynacoal still in the market for a ship to carry this cargo on Dec 13? This further illustrates that the December 3 sales contract is a fabrication, and was back-dated after the fact.

(iii)   The deal itself makes no commercial sense. Mr. Mizrakci states that Dynacoal sold the cargo to Global Coal because Global Coal saw an opportunity to make a profit. What about Dynacoal? Why did it sell the coal? The payment terms of the purported sales contract (¶ 9 of Ex H) show no profit whatsoever, and merely call for Global Coal to take over the same payment obligation to the Chinese supplier that Dynacoal otherwise had. Mr. Mizrakci offers no explanation, on this supposed arms length deal, as to why Dynacoal would sell the cargo for no profit. This is no more than a maneuver between entities controlled by Mr. Mizrakci to get Dynacoal's name out of the transaction and avoid the attachment. It's not a sale.

(iv)   The price of coal also reflects the illusory nature of this supposed "sale." According to the proffered sales contract, the price paid by Global Coal to Dynacoal ($87/ton as per Clause 5 E of Ex H) is completely out of line with the market at that time. In the first week of December, when Dynacoal *supposedly* sold the cargo to Global Coal, the going price, as reported in the Financial Times Commodities and Agricultural Publication, was $102.96 per ton FOB Qinhuangdao. But Dynacoal sold it to Global Coal for only $87 per ton, the same price Dynacoal was supposed to pay to CNCIQ. That is absurd, and defies any business logic which would support such a transaction. The difference ($15.96/ton) multiplied by the number of tons loaded, indicates that Dynacoal thus sold the cargo to Global Coal for **$1,005,719 below the current market price.** Mr. Mizrakci argues that this sale was legitimate and was done because it represented an "opportunity" – but for whom? Certainly not for Dynacoal.

(v)   The terms of the sales contract itself are nonsensical. In Mr. Mizrakci's haste to create a sales document after reading our opposition, he obviously did a cut and paste job from the real sales contract between Dynacoal and the supplier CNCIQ. By way of illustration, Clause 13 of the proffered new sales contract provides for arbitration *in Mongolia.* (*See* Ext H.) Are we to believe that these two BVI captives of Mr. Mizrakci actually agreed to Mongolian arbitration for any disputes between them?

(vi)   The numbers in the contract don't match with the subject shipment either, nor does the amount which Mr. Mizrakci *claims* that Global Coal paid to the supplier. In an effort to manufacture some proof of payment by Global Coal for the shipment, Mr. Mizrakci submits, as Ex I, the instructions he supposedly sent to his bank for a payment to CNCIQ (the supplier) for *"the cargo shipped on this vessel."* (*See* Mizrakci Dec'l at ¶ 7.) That payment on Dec 13 related to a shipment of *exactly 66,091.95 metric tons* of coal. (*See* Ex I, payment order referencing precisely 66,091.95 M/T of coal, and similar representation in the wire transfer details at the bottom of page 2 of Ex I). But the subject shipment on the BRIGHT ZHEJIANG was significantly less. By Mr. Mizrakci's own admission, the shipment on the subject vessel totaled only 63,015 M/T. (*See*, the two bills of lading he now annexes as Exhibit J comprising the shipment on the BRIGHT ZHEJIANG adding up to only 63,015 M/T). Therefore, the proof of payment proffered as having been made for the subject shipment shows *a completely different and greater amount,* and simply does not match the quantity loaded on the BRIGHT ZHEJIANG. It is no proof of an actual sale divesting Dynacoal of an interest in the shipment.

(vii)   Further, if Global Coal was actually paying the Chinese supplier CNCIQ on December 13th *for the cargo on the BRIGHT ZHEJIANG,* as Mr. Mizrakci now claims, how did he know how much to pay? The ship hadn't even arrived yet, and no cargo had been loaded as of that date (see Ex. J, the purported bills of lading, showing loading not completed until December 22).

(viii)   Better still, are we to believe that this sophisticated coal trader actually paid, *in advance,* the Chinese supplier in excess of $5.75 million *before* the cargo was loaded? In 30 years of world-wide commodities trading, I have never seen anyone agree to pay cash, in advance, for a cargo before the vessel had arrived/loaded. This presents an incredible exposure because paying in advance leaves the buyer with absolutely no assurance that the cargo will ever be loaded. These transactions are simply not done this way.

(ix)   Accordingly, this supposed Dec 13th payment is either: (a) an illusory payment altogether, or (b) represents payment for a prior Dynacoal shipment of 66,091.95 M/T of cargo, and cannot represent payment for the subject cargo which, as of December 13th, had not even been loaded yet and was for a totally different amount of cargo. As such, it does not support the sale transaction upon which Mr. Mizrakci builds his entire argument, and it does not support the position that Dynacoal, by virtue of this supposed sale to Global Coal, was actually divested in its interest of the cargo, the freight or the transaction.

## No Explanation is Provided Why Mr Mizrakci Had Two Sets of Bills of Lading

4.   Further, no explanation is given as to why a bill of lading was available at the load port in the name of Dynacoal (dated December 22), or how Mr. Mizrakci came up with his two new bills of lading. This will only become clear through discovery, but *we* certainly did not create that original bill of lading which lists Dynacoal as the consignee (see Ex H to my original Declaration). That original

document matches precisely with the quantity of coal which Mr. Mizracki acknowledges was loaded (*See* Exhibit J). Whether they were subsequently issued by the owners of the vessel at the request of Mr. Mizrakci in order to mask the manufactured shift of the identity of the consignee from Dynacoal to Global Coal, will only be revealed through discovery. But the evidence on ownership does indeed reflect Dynacoal's involvement at the time of loading (well past the supposed sale contract date of Dec 3) and conflicts with Mr. Mizrakci's story that Dynacoal had already "sold" its interest.

5.    Mr. Mizracki's does not deny anywhere his declarations that he controls all these entities, including Dynacoal, Global Coal, Super Enerji, etc., yet he claims this was an arms length transaction. Since he controls all of these shells, however, he is in effect signing the sales contract for Dynacoal with his left hand and for Global Coal with his right. This is not an arms length deal.

6.    The eventual disposition of the cargo is equally telling. Mr. Mizrakci claims that it was "sold" to his other company, Super Enerji. This comes as no surprise, as this was the entity to which Dynacoal routinely delivered all of Mr. Mizrakci's coal shipments. But the supposed mark-up price paid is almost as unusual as was the mark up supposedly charged by Dynacoal to Global Coal (which was zero!).

7.    Here, Mr. Mizrakci claims that after he bought the cargo from himself (i.e. sale from Dynacoal to Global Coal) he (Global Coal) then sold part of it to himself (i.e. Super Enerji, his local captive) and the rest to himself (i.e. China Coal, another of his BVI captives) who then sold back to himself in the form of Super Enerji.

8.    Here, he claims that Global Coal made a $3.00 profit per ton, and this supposedly legitimized the whole deal. The going price tells otherwise.

9.    In this respect, the market for this coal in mid January was much higher than what he claims to have sold it for.

10.    In his declaration, he introduces supposed sales invoices dated January 18, 2008 as evidence of these supposed downstream sales, all at $90/ton FOB. (*See* Exhibit K). At that point in time, however, the 90 day forward benchmark price assessment for this grade of coal was $102.00 FOB. Why was Global Coal now willing to sell it to Super Enerji for $12.00 below the market if these were real, arms length transactions? That is a $700,000 plus savings. Not very arms length.

11.    And where are the actual sales contracts, and where is the proof of these payments, as the ship has already delivered the cargo? Are we to believe that these sales actually took place, the

cargo was delivered, and no payments were made?  Such would never occur in an arms length transaction.

12.  To the extent all these entities are controlled by Mr. Mizracki, the documents do not show a bona fide transaction, but rather a paper transaction manufactured after-the-fact to distance Dynacoal from this deal and avoid this Court's order.

13.  Equally missing is the underlying documentation to show the original transaction:

(i)  Where is the long term supply contract between Dynacoal and CNCIQ?
(ii)  Where is the correspondence between Dynacoal and Global Trade under which they suddenly decided to sell/buy the cargo on December 3?
(iii)  Where is the correspondence between Dynacoal, Global Trade and CNCIQ relating to the nomination of a substitute buyer?
(iv)  Where are all the documents called for under Clause 10 of the proffered sales contract which requires production of commercial invoices, bills of lading, certificates of weight, etc.  These documents, which in the real world of commodities sales are presented after the cargo is loaded and based on which payment in the real world is made.  All these documents are curiously absent from Mr Mizrakci's presentation, and should be disclosed to the extent they really exist.
(v)  Where are the fixture negotiations for the charter of the vessel?

14.  Equally unbelievable is the timing of the downstream sales by Global Coal to Super Enerji and to China Coal.  Are we to believe that Global Coal paid $8.963 million for freight and cargo in mid-December and yet did not even seek reimbursement from these other related entities until January 18, 2008?

15.  At bottom, the Plaintiff submits that what Mr. Mizrakci has done (with his set of controlled shell entities) is to create the illusion of a sale where no such transaction took place, to avoid the attachment.  We respectfully submit that his effort should be rejected because the proffered documents do not support a legitimate sales transaction, some actually appear to have been generated after the fact, and the supposed payment supporting this whole sale does not even relate to the subject shipment, but rather a prior shipment.  Despite his statements to the contrary, the evidence now before this Court shows that Dynacoal does in fact have an interest in the frozen payment because there was no bona fide sale transaction, which took place before Mr Mizrakci performed his corporate slight of hand, and thus it cannot support the argument proffered.

I declare under penalty of perjury the foregoing is true and correct.

_____
                    Edward Coll

Providence, Rhode Island
February 5, 2008